UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re: Case No.: 1:24-bk-18942-RAM

RANEE A. BARTOLACCI, Chapter 7

Debtor.
_______________________________/

**NOTICE OF FILING TRANSCRIPT OF 341 CREDITORS MEETING OF CREDITORS**

YH Lex Estates, LLC ("YH"), a creditor and party-in-interest, by and through its co-counsel, Berger Singerman LLP and Klestadt Winters Jureller Southard & Stevens LLP, does hereby give notice of the filing of the attached Transcript of the 341 Meeting of Creditors held on October 10, 2024.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF Service upon all parties listed on the Electronic Service List on this 2nd of January 2025, including Luis Salazar, Esq., Debtor's Counsel; Robert A Angueira, Trustee, and the AUST; and via U.S. Mail upon the Debtor, Ranee A. Bartolacci at 501 NE 31st Street, Unit 1506, Miami, Florida 33137.

I HEREBY CERTIFY that I am admitted to the Bar for the District Court in the Southern District of Florida and am in compliance with the additional qualifications to practice before this Court as set forth in Local Rule 2090-1(A).

Dated: January 2, 2025

Respectfully submitted,

Kathleen Aiello, Esq. (admitted *pro hac vice*)
Tracy Klestadt, Esq. (admitted *pro hac vice*)
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Email: kaiello@klestadt.com
tklestadt@klestadt.com
-and –

BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500

Facsimile: (305) 714-4340

By: /s/ Jordi Guso
Jordi Guso
Florida Bar No. 0863580
jguso@bergersingerman.com

*Co-Counsel for YH Lex Estates, LL*

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Robert A Angueira** trustee@rabankruptcy.com, fl79@ecfcbis.com;raa@trustesolutions.net;tassistant@rabankruptcy.com;richard@rabankruptcy.com;lillian@rabankruptcy.com
- **Nestor C Bustamante** nbustamante@cozen.com, nestor-bustamante-2974@ecf.pacerpro.com
- **Heidi A Feinman** Heidi.A.Feinman@usdoj.gov
- **Yanay Galban** yanay@rabankruptcy.com, robert@rabankruptcy.com
- **Jordi Guso** jguso@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.courtdrive.com
- **Office of the US Trustee** USTPRegion21.MM.ECF@usdoj.gov
- **Luis Salazar** Luis@Salazar.Law, luis-salazar-4791@ecf.pacerpro.com;Ceide@salazar.law;Lee-Sin@Salazar.Law;Suarez@Salazar.Law;Lorenzo@Salazar.Law;MSalazar@Salazar.Law

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: CASE NO. 24-18942-CLC

RANEE A. BARTOLACCI,

Debtor.
___________________________________/

341 MEETING OF CREDITORS

October 10, 2024

The above-entitled cause came on for a Section 341 Meeting of Creditors before Robert Angueira, one of the trustees in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, via Zoom, on October 10, 2024, commencing at or about 8:30 a.m., and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

APPEARANCES VIA ZOOM:

ROBERT ANGUEIRA, Trustee

SALAZAR LAW, by
LUIS SALAZAR, Esquire
On behalf of the Debtor

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, by
KATHLEEN AIELLO, Esquire
On behalf of YH Lex Estates, LLC

- - - - - - -


WITNESS

| Ranee Bartolacci | Page |
| --- | --- |
| Examination by Mr. Angueira | 4,24 |
| Examination by Ms. Aiello | 18 |

MR. ANGUEIRA: Good morning. My name is Robert Angueira. I am the Chapter 7 trustee that's been assigned to administer your cases.

This morning I will be asking you questions about your bankruptcy filing, petitions, schedules and the documents that your attorneys uploaded to me electronically.

If I ask you a question and you do not understand the question, tell me you don't understand the question, otherwise I'm going to assume you understood the question.

When you accepted your Zoom invitation, you agreed to certain procedures, including the fact that it is illegal to tape, or videotape any part of this proceeding. That is contrary to the law and it can subject you to sanctions by the Bankruptcy Court.

If I have not called your case, unless you're the first one, keep your phone on mute, or your video on mute and turned off. When I call your case, you turn it back on.

Please do not have distractions when I have called you and we are conducting the 341.

You have just been -- you will be sworn in under penalty of perjury. It is a federal crime to lie in a bankruptcy proceeding, and the penalties can include

five years in jail, $500,000 in fines, and the denial of your discharge.

(Spoke in Spanish.)

MR. ANGUEIRA: For the benefit of all, if I do not basically resolve the case today, I will be asking for 90 days on exemption and discharge. It is nothing particular to your -- it's nothing specific to your particular case. My attorney, Yanay Galban, is on maternity leave, and I need a couple of months to work through that.

Okay. So the first case, Ranee A. Bartolacci, 24-18942.

Ma'am, would you raise your right hand?

Do you swear or affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MS. BARTOLACCI: Yes.

Thereupon,

RANEE BARTOLACCI,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ANGUEIRA:

Q. What is your name, ma'am?

A. Ranee Bartolacci.

Q. Ma'am, are you still living at 501, the address on your petition?

A. Yes, I am.

Q. Your driver's license gives a Jupiter address. When you lived in Jupiter, did you rent, or did you live with family members, or what?

A. I lived with my parents.

MR. ANGUEIRA: Okay. I've compared driver's license and Social Security with the original documentation, with the exception of the address they match.

Would the attorney for the debtor please make an appearance?

MR. SALAZAR: Good morning, Mr. Trustee. Luis Salazar, of Salazar Law, on behalf of Ms. Bartolacci.

MR. ANGUEIRA: Sir, do you swear or affirm that the person on the video is the person you filed the bankruptcy for?

MR. SALAZAR: Yes, sir, I do.

MR. ANGUEIRA: Thank you.

BY MR. ANGUEIRA:

Q. Ma'am, have you ever filed for bankruptcy before?

A. No, I have not.

Q. Did you read the information sheet from the

Department of Justice?

A. Yes, I did.

Q. Did you have an opportunity to go over your bankruptcy petition and schedules at your attorney's office, and if you had any questions, were you able to ask them?

A. Yes, I was.

Q. Did you personally sign all the bankruptcy-related documents?

A. Yes, I did.

Q. Did you disclose all of your assets, all your income, and all your liabilities?

A. Yes, I did.

Q. Are you personally familiar with all of the financial information that is contained in these bankruptcy documents?

A. Yes, I am.

Q. Is that information true and correct?

A. Yes, it is.

Q. Are there any changes, modifications, or errors that you need to bring to my attention?

MR. SALAZAR: May I --

THE WITNESS: No.

MR. SALAZAR: May I address that, Mr. Trustee?

MR. ANGUEIRA: Yes, go ahead.

MR. SALAZAR: We'll be making an amendment, there are two additional accounts that we need to disclose, some other creditors and some other litigation that's to be listed, but nothing substantive.

MR. ANGUEIRA: When you say "accounts", you mean, like, bank accounts?

MR. SALAZAR: Yes, there is one additional account, and you'll see there is one entity listed as, it's called Twisted with Love, a corporation that's valued at $2,000. We were able to locate the bank account information for that account, so we'll be disclosing that as well.

MR. ANGUEIRA: Now it's valued at $2 million. Okay.

MR. SALAZAR: No, 2,000.

MR. ANGUEIRA: Yeah, now it's 2 million.

MR. SALAZAR: And --

MR. ANGUEIRA: Mr. Salazar, if you could try to get that to me by Monday --

MR. SALAZAR: Yeah.

MR. ANGUEIRA: -- you know, file it with the Court?

Thank you.

BY MR. ANGUEIRA:

Q. Ma'am, other than what your attorney just said, do you have any other changes, modifications, or errors that you need to bring to my attention?

A. No, I do not.

Q. Does somebody owe you money?

A. Yes.

Q. Who would that be, other than your husband who is in jail?

A. No.

Q. Okay. Can you file a claim, or file a lawsuit against someone other than your husband who is in jail?

A. Yes, I have potential claims against attorneys who represented me without my knowledge, and we listed those on the schedules.

MR. ANGUEIRA: Mr. Salazar, are all of those listed somewhere on the schedules?

MR. SALAZAR: Yes, we listed, to the best -- as best we could, all potential claims against third parties, including malpractice claims.

BY MR. ANGUEIRA:

Q. Okay. Ma'am, please go over that with your attorney, and if there's anything that's missing, please, let him know so he can amend it at the same time, okay?

A. Will do. Thank you.

Q. All right. Now, do you owe child support or alimony?

A. No, I do not.

Q. Did you file a tax return in 2022 and 2023, and if you did, did you provide me true and correct copies of those tax returns?

A. Yes, I have.

Q. Ma'am, what happened to the property at 35 Murray Drive in Easton, Pennsylvania?

A. That was a home I owned, and it was sold.

Q. More than four years ago?

A. Yes.

Q. 3813 Hecktown Road in Easton, Pennsylvania?

A. Uh-huh.

Q. Uh-huh what? You sold it? Do you still have it?

A. Oh, no, that is a -- that is a business not related to me.

Q. Okay. Have you ever been on the deed at 3813 Hecktown Road in Easton, Pennsylvania?

A. On the deed?

Q. Yes, I assume this is a property, and properties have deeds. Have you, to your knowledge, ever been on the deed?

A. Not to my knowledge. That is a business,

and I worked for that business.

Q. The owner of that business, are they related to you by blood or marriage?

A. I believe the owner is a company, and, yes.

Q. Okay. When you say "yes", tell me what you're saying yes to.

A. So, the company is a 38 -- that is a company, an LLC, and they're -- and I worked for --

Q. Okay. Who owns the company?

A. Currently, I don't know.

Q. Who owned it when you said the owners were related to you by blood or marriage?

A. It was -- there was a -- I believe there was a parent company, I guess for a better -- lack of better terminology.

Q. Okay. Tell me who owned it.

A. Who owned it?

Q. What is the name of the company, and then who was way at the top? Was it your father, your mother, your husband, a friend?

A. It was a corporation. I believe it's called -- it was a corporation I believe called RAB Management Corporation. This was a while ago.

Q. Wait, wait, wait, hold on. R-A-D, is that what you said?

A. B, as in boy.

Q. P?

A. B, like boy.

Q. B, okay.

A. And --

Q. Wait, wait, wait, B what, what are the initials again?

A. R, as in rabbit, A, as in apple.

Q. BRA, okay.

MR. SALAZAR: No, the other way around, R-A-B, RAB.

MR. ANGUEIRA: R-A-B, okay.

BY MR. ANGUEIRA:

Q. That was the corporation. Who owned that corporation?

A. I'm not sure how that was set up. I worked for that corporation.

Q. Ma'am, ma'am?

A. Yes.

Q. You told me that the owners were related to you by blood or marriage. Who owned it other than RAB?

A. I am -- I believe, again to the best of my knowledge, I believe my family owned it. Maybe my dad, maybe I had a share. I'm not sure, I'm not entirely sure, I'm sorry.

MR. ANGUEIRA: Okay. Mr. Salazar, I'll be asking for this, but if you could start with 3813 Hecktown Road, Easton, Pennsylvania, that seems to be a property, if you could get me --

MR. SALAZAR: Of course.

MR. ANGUEIRA: -- the history of the deeds, of who owned it, and if it was an LLC company, the name of the company, and who owned that company, and if that company was owned by RAB, the owners of RAB.

Thank you.

MR. SALAZAR: Yes.

MR. ANGUEIRA: Okay?

MR. SALAZAR: Yes, no problem.

BY MR. ANGUEIRA:

Q. Ma'am, do you own right now any house, condo, townhouse, land, timeshare or cemetery plot?

A. No, I do not.

Q. Have you owned any land, home, house -- home, house, condo, townhouse, cemetery plots or land in the last four years? Any real estate?

A. No, I have not.

Q. Do you have an interest in any corporation that owns any real estate?

A. I have an interest -- not a corporation, I have an interest in a limited partnership that --

Q. We're going to get to that in a second.

First, do you have any interest in any corporation at all?

A. No, I do not.

Q. Do you have any interest in any partnership anywhere in the world?

A. I have an interest in a limited partnership.

Q. Okay. Who are the other partners, friends, family members, strangers?

A. Family members.

Q. And what is the name of that partnership?

A. So, one is Fairfield Development.

Q. Fairfield Development, okay, and the other one?

A. It is Bart8, B-a-r-t, the number 8.

MR. ANGUEIRA: Mr. Salazar, did you disclose those somewhere in here?

MR. SALAZAR: Yes, sir, in the schedules, sir.

MR. ANGUEIRA: Thank you. Thank you.

BY MR. ANGUEIRA:

Q. Ma'am, do you have an interest in any trust of any kind?

A. No, I do not.

MR. SALAZAR: I'm sorry, if I may just

correct it.

There is disclosed a trust in the schedules. We're just not clear what her relationship to that trust is.

MR. ANGUEIRA: Okay. Thank you.

BY MR. ANGUEIRA:

Q. Ma'am, do you own a car, boat or motorcycle?

A. No, I do not.

Q. Did you list all of your bank accounts, and all your brokerage accounts, with the exception of the two that Mr. Salazar said he was going to amend?

A. Yes, I have.

Q. Are you currently working?

A. No, I am not.

Q. Who gives you money so you can survive?

A. My father has loaned me money.

Q. What did you just say, your father gives you money and loans you money, is that what you said?

A. My father gives me money. Yes, my father is giving me money.

Q. Okay. Now, when you said "loaned", there are no written loan documents between you and any of your family members, correct?

A. No, promissory notes.

Q. There are or there are not?

A. There are promissory notes, yes.

Q. Okay, and they date back to when?

A. They date back to 2023, maybe March of 2023, around there, April of 2023.

Q. Approximately how many of these promissory notes are there?

A. There are a lot of promissory notes. I want to say there is 40, 50. There is quite a few.

Q. You said 40 to 50, correct?

A. I think so. I have them filed, and I have them all accounted for, but there are quite -- there are a lot.

MR. ANGUEIRA: Okay. Now, Mr. Salazar, these 40 to 50 promissory notes, are they listed somewhere on Schedule F?

MR. SALAZAR: The promissory notes are listed on the schedules, I'm not sure if they total that high, but they are quite considerable, yes.

BY MR. ANGUEIRA:

Q. Okay. Ma'am, would you compare the promissory notes that you have in your files with what Mr. Salazar put on Schedule F, or whatever schedule he put it in, but it would probably be Schedule F, to make sure that all of them are listed?

A. Yes.

Q. Now, on the 40 to 50 promissory notes, have you ever made a payment on any of them?

A. No, I have not.

Q. And, of course, your family has not taken any action to enforce the promissory notes because you're their daughter, right, or sister, or whatever relationship you have with them, right?

A. Yes, uh-huh.

MR. ANGUEIRA: Okay. I have no further questions at this time.

I will be setting you for a Rule 2004 Examination. Mr. Salazar and I talked about this, and he's aware of it. We've been through this in many cases before.

The other thing that I'm going to ask you is, we will contact Mr. Salazar to have an appraiser go to wherever you're at, and wherever your personal property is at, and do a valuation of all your personal property and your jewelry. Mr. Salazar will explain this.

Anything that you can provide the appraiser, as far as a list of things, will make the process go a lot farther.

THE WITNESS: Okay.

MR. ANGUEIRA: For example, if you have 15 pieces of jewelry, I'm making the number up, and you

give him a list, and say here, they're on top of this table, that will be very, very fast, versus, oh, this one is in this drawer, or this one is in that drawer, or this one is in this bag, then it would take a long, long time.

THE WITNESS: I'll have it organized for him. I understand, yes.

MR. ANGUEIRA: Okay. Now --

MR. SALAZAR: Mr. Trustee, just so you know, that we -- prior to filing I asked one of your colleagues, Mr. Brown, Trustee Brown, Scott Brown, for a referral for an appraiser, and I used his appraiser. So we have it neatly organized in a very recent appraisal. We'll provide that.

MR. ANGUEIRA: That's fine.

So, in other words, I don't know who that person is, but --

MR. SALAZAR: Right.

MR. ANGUEIRA: -- if it was Mr. -- if Mr. Stampler goes out there and there's a list, and he sees the list, and he sees the jewelry, that will go a lot faster than, well, let's see, I've got to hunt for it somewhere in this house.

MR. SALAZAR: It's very well organized.

MR. ANGUEIRA: Now, I'm going to ask if there is anybody else on Zoom that would like to ask the

debtor some questions.

Now let me explain that, number one, this is not a Rule 2004 situation. This is supposed to be 5 to 10 minutes, and I've already taken 20.

So, if you want to cross-notice my Rule 2004 Examination, or take one on your own, you're certainly willing and able to do all of that.

However, at this point I will turn it over and ask if there is anybody in the video, the Zoom that would like to ask some brief questions of the debtor?

MS. AIELLO: Yes. Thank you, Mr. Angueira. Good morning. My name is Kathleen Aiello on behalf of YH Lex Estates, a creditor in this case, as well as others, and I would be -- I would like to ask a few questions, if you'll permit me.

MR. ANGUEIRA: Go ahead, ma'am.

MS. AIELLO: Great. Thank you.

EXAMINATION

BY MS. AIELLO:

Q. Good morning, Ms. Bartolacci. How are you?

A. Good morning. Good. How are you?

Q. Good. Thank you.

I wanted to just clarify a few of the comments you raised.

So you had mentioned -- you have listed

several corporate interests, or an interest in different partnerships. When was the last time -- or are you not currently receiving any distributions from those companies?

A. No, I am not.

Q. Okay. Do you know when the last time you may have received a distribution from any of those companies in the past?

A. Repeat the question again.

Q. Do you know the last time you -- within what timeframe you received the last distribution from any of those companies that you've listed?

A. As I sit here right now I don't recall.

Q. Okay. Are you -- a couple of other potential companies. Are you familiar with RAB Two, LLC, is that a company that's familiar to you?

A. As I sit here, I don't recall the company. How -- I don't recall the company. RAB Two?

Q. RAB Two, I assume RAB being your initials?

A. I don't know anything about the company off the top of my head, but my ex-husband did create multiple companies in my name. So could that be one? Yes, it could.

Q. Okay. And RSV Three, LLC?

A. That one, yes, he did create, again,

multiple companies in my name. I know there were a bunch of RSV Threes.

Q. There were more than one RSV -- or just more than one RS --

(Two people speaking.)

A. -- schedules, if you look, we listed a few, but I can't remember the exact names.

Q. Okay. Yes, I believe RSV One, LLC and RSV One Investments, LLC.

But, okay, and do you know the nature or what the purpose of any of those entities was?

A. I don't know the purpose, no.

Q. Okay. You listed on Page 5 of your schedules, which is for certain accounts, education accounts for your children, I assume. LON, I believe, and -- for the benefit of, are those your children?

A. (No verbal response.)

Q. They're Charles Schwab accounts.

A. Oh, okay, so those are 529s set up by my father for my children. There is three of them, correct, the beneficiary of.

Q. Yes, there is FBO ZAN, EAN and LON, those are your children?

A. Yes, those are my three children, and they were 529s set up by my father, yes.

Q. Okay. So when were those established. Do you know?

A. I believe -- I mean, I believe that they were established very quickly after each child was born.

Q. Okay, and who funds those?

A. My father funds those.

Q. Exclusively?

A. Yes.

Q. Okay, and you listed five checking accounts on your schedules, on Page 3 if you need to reference them. They all have mostly $0 balances, or very small balances. Have you recently closed any bank accounts prior to the bankruptcy, let's say within two years of the bankruptcy, did you close other bank accounts?

A. Can you -- I don't have the -- do you want me to look in the book to see what you're referring to, or can you just tell me?

Q. Well, I'm saying that you've listed on Page 3 of your schedules five different checking accounts, all of which have either zero balance, or I think one has $3.48, but are there bank accounts that you've closed that are not appearing on these schedules within the last year, or even two years prior to your bankruptcy filing?

MR. SALAZAR: If you can remember, Ms. Bartolacci.

THE WITNESS: I don't recall. I don't remember. I don't know.

BY MS. AIELLO:

Q. Okay, and you received -- so you're receiving, I think, fairly -- you've disclosed on your schedules you've been receiving loans, and you just testified that you received numerous loans from your father. Are those loans being deposited in these accounts, such that they might be reflected in these balances?

A. Sorry, my kids are home from school.

Q. That's okay. Yes, I figured, I figured. No problem.

A. Sorry.

(Two people speaking.)

THE WITNESS: Let me make clear that, you know, I don't know that was the correct terminology. I have -- my dad is paying my legal bills directly, and he is -- and those promissory notes are written to him. My dad is also paying for my expenses for my children and I to live. I have kept, you know, detailed, I guess, logs of what I'm spending. Those promissory notes are for him.

So I don't know if I used the correct terminology "loan" there or not, but that's -- and I hope I'm answering your question.

BY MS. AIELLO:

Q. Okay. So, just to be clear as to the actual logistics of how those loans are paid, does your father pay them to you, and then you pay those expenses, or does your father pay the expenses directly for your benefit?

A. He pays the expenses directly for my benefit.

Q. Okay. So in the loan that you've disclosed, that was made on July 11th of this year for $4.2 million, roughly, that was paid directly to other third parties, and not directly into your accounts, is that correct?

A. It's a -- okay, again, with the word, maybe I misstated the word "loan."

The $4.2 million, I believe, if I'm remembering correctly, that was for litigation and, yes, he paid the attorneys directly.

Q. Okay. Is that one attorney or multiple?

A. Multiple attorneys, multiple.

Q. And just to clarify, in terms of total, you've had -- you've listed, I think in one of those instances, where perhaps your counsel, your current bankruptcy counsel, or maybe prior counsel for other matters, was paid by your father, a Mr. Rodenstein, I believe, Rodenstrike (phonetic), I believe. Are those in addition to the loans that are referenced on the

schedules, or overlapping with those same amounts?

Because I think there was about, a little more than $2 million referenced in a different section, and maybe Mr. Salazar knows this better, but is that in addition to the loans referenced as being owed directly to your father, or overlapping with? I'm just trying to understand the total magnitude of the debt?

MR. SALAZAR: So let me just object to the form of the question, it's a little confusing, but answer it, Ms. Bartolacci, if you can.

THE WITNESS: So maybe this is where I'm -- the promissory notes, do they overlap in my schedules? I'm not looking at it, again, but, no, I don't believe they overlap. I believe that those are -- sorry -- that those are, like, promissory notes that do not overlap and I owe to my father.

MR. ANGUEIRA: Okay. I think we can continue in a Rule 2004 setting.

Ma'am, I have one last question before I conclude this.

THE WITNESS: Of course.

CONTINUED EXAMINATION

BY MR. ANGUEIRA:

Q. Of the approximately $13 million that your husband gave to you, are you holding any portion of that

money in any way, shape or form?

MR. SALAZAR: So, just so I -- slow down.

I object to the question on the "gave" part, but, please, Ms. Bartolacci, answer the question.

BY MR. ANGUEIRA:

Q. Gave, loaned, transferred, whatever you want to use, whatever word you want to use, gave, loaned, transferred, handed to you, of the approximately $13 million, are you holding any of that money today?

A. No, I do not hold that money today.

Q. Any of your friends or family members, are they holding any part of the $13 million for you?

A. No, they are not. No one is.

MR. ANGUEIRA: Okay. The meeting is concluded.

Mr. Salazar, will she agree to 90 days on exemption and discharge?

MR. SALAZAR: Yes, she is. As a matter of fact I was going to mention that before we drop off.

MR. ANGUEIRA: Okay. Thank you all. The meeting is concluded.

(Thereupon, the 341 Meeting of Creditors was concluded.)

CERTIFICATION

STATE OF FLORIDA :

COUNTY OF MIAMI-DADE :

I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing Section 341 Meeting of Creditors was transcribed by me from a digital recording made on the date and at the place as stated in the caption hereto on page 1; that the foregoing computer-aided transcription is a true record to the best of my ability of said proceedings.

WITNESS my hand this 16th day of December, 2024.

______________________________

CHERYL L. JENKINS, RPR, RMR

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #HH 170910
December 27, 2025