UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

IN RE:                                                  Case No.: 24-18942-RAM

RANEE A. BARTOLACCI,                                    Chapter 7

      Debtor.

_____/

YH LEX ESTATES LLC,

      Plaintiff,                                       Adv. No. Pro.: 25-_____- RAM

vs

RANEE A. BARTOLACCI,

      Defendant.

_____/

**COMPLAINT OF PLAINTIFF/CREDITOR YH LEX ESTATES LLC SEEKING
ENTRY OF A JUDGMENT DECLARING THE DEBTOR'S OBLIGATION TO BE
NONDISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(A) AND
DENYING THE DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727(A)**

YH Lex Estates LLC ("YH" or the "Plaintiff"), a creditor and party in interest of the estate of

Ranee A. Bartolacci, the above-captioned debtor (the "Debtor", the "Defendant" or "Bartolacci"), by

its general counsel, Klestadt Winters Jureller Southard & Stevens, LLP and its local counsel, Berger

Singerman LLC, as and for its complaint (the "Complaint") herein against the Defendant, seeking (i) a

determination, pursuant to 11 U.S.C. §§ 523(a)(2) and (6), that the debt owed by the Defendant to the

Plaintiff is non-dischargeable; (ii) denial of the Debtor's discharge pursuant to 11 U.S.C. §§

727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4), 727(a)(5); and (iii) related relief, including the

payment of attorneys' fees and costs, that this Court determines is reasonable and just under the

circumstances and, alleges as follows:

13559119-7

## INTRODUCTION

1.       This adversary proceeding seeks a determination that a debt owed by the Debtor, Bartolacci, to the Plaintiff is non-dischargeable under 11 U.S.C. § 523 due to the Debtor's knowing participation in the Meir-Bartolacci judgment-evasion fraud scheme, alleged herein.  YH seeks to hold Bartolacci financially accountable for millions of dollars of economic injury she has caused by her knowing participation in this fraud scheme.

2.       Collection of YH's judgment against Bartolacci's ex-husband, Nir Meir ("Meir"), described herein, was thwarted by Bartolacci's efforts to conceal the receipt of fraudulently conveyed assets from Meir, and by secreting those assets out of New York to evade the jurisdiction of the New York courts.  Bartolacci then dissipated the fraudulently conveyed assets, as she hid from process services and submitted false affidavits with the intent of misleading YH and courts in New York, Florida and Delaware, thereby frustrating YH's judgment enforcement efforts.  Bartolacci's pattern of fraudulent conduct, as alleged herein, is egregious.  Moreover, hers is not the behavior of an honest, but unfortunate, debtor, which the bankruptcy process seeks to reward.   Therefore, Bartolacci's discharge should be denied in its entirety.  At a minimum, YH's claim against Bartolacci should be excepted from discharge.

### A.  The Meir-Bartolacci Fraud Scheme

3.       This adversary proceeding stems from an interspousal fraudulent conveyance scheme through which the initial debtor, Meir, tried to make himself judgment-proof by transferring nearly thirteen million dollars to Bartolacci, his wife at the time of the initial transfers and the Debtor herein, and Ermitage One LLC ("Ermitage"), an entity owned and controlled by Bartolacci, on the eve of

13559119-7

entry of judgment against Meir.[1] To facilitate their scheme, Meir and Bartolacci had the assistance of the New York and Florida law firm, Davidoff Hutcher & Citron LLP ("DHC").

4.      Bartolacci engaged in a brazen judgment-evasion fraud scheme with Meir.  Her actions aided and abetted the scheme and enabled the couple to abscond with millions of dollars that otherwise would have been available to satisfy the Meir Judgment.

5.      Bartolacci's actions impeded and interfered with YH's judgment enforcement efforts and its ability to collect assets that were fraudulently conveyed to her, totaling approximately $13 million.  These funds represented the net proceeds from the eve-of-judgment sale of the $44 million mansion located at 40 Meadow Lane, Southampton, New York ("40 Meadow Lane").  Although Bartolacci had no legitimate claim to ownership of this asset, the sale proceeds were then secreted to Bartolacci, and her shell entity, Ermitage.

6.      Ermitage was established just prior to the sale of 40 Meadow Lane.  More than $10 million of the proceeds from the sale of 40 Meadow Lane were then transferred to Bartolacci in a classic interspousal fraud scheme, and another $2 million was transferred to her Ermitage entity (hereinafter collectively referred to as the "Fraudulently Conveyed Assets").  Bartolacci then formed a second Ermitage entity in Florida and merged the New York Ermitage into the Florida Ermitage, with the assistance of DHC.  Bartolacci executed the Ermitage documents and had numerous direct communications with her attorneys at DHC, without Meir's involvement, regarding the concealment

---

[1] Bartolacci's former spouse, Meir, was the Managing Principal of the real estate development company HFZ Capital Group LLC ("HFZ") that imploded in New York in late 2020.  YH's underlying lawsuit against Meir, Ziel Feldman ("Feldman"), and HFZ in November 2020 in New York -- *YH Lex Estates LLC v. HFZ Capital Group LLC,* Index No. 655980/2020, referred to herein as the "*YH-Meir Action*" -- resulted in the entry of a nearly $20 million judgment against Meir (the "Meir Judgment").

of Ermitage and its assets to Florida.[2]  Bartolacci then laundered part of the funds back to Meir.

7.      Bartolacci, with the assistance of DHC (with whom she maintained a close, personal relationship, for example, attending yoga classes with lead partner Larry Hutcher ("Hutcher") and privately meeting with Hutcher at the Hard Rock Hotel in Florida to thank him for his assistance and representation throughout this scheme, including in multiple Florida proceedings), established a complex web of shell entities and bank accounts in her own name and in the name of various entities that she owned and controlled.  DHC concurrently represented Bartolacci and her Ermitage entity in connection with the sale of 40 Meadow Lane, assisted Bartolacci in evading YH's judgments, and represented Bartolacci through various proceedings in Florida to oppose enforcement of YH's judgment against her.  DHC also represented Bartolacci in a protracted dispute with the landlord of her Miami Beach rental property.

8.      Among other things, Bartolacci (i) negotiated the lease for a Miami Beach waterfront property (with the assistance of DHC) and wired a lump sum payment of approximately $1.625 million in cash to the landlord, as she and Meir fled New York one step ahead of YH's judgment, and spent an additional approximate $600,00 of the fraudulently conveyed assets on "improvements" to the rental property; (ii) Bartolacci, with the assistance of DHC, re-registered Meir's fleet of luxury automobiles in her own name or in the name of her various shell entities; (iii) Bartolacci hid from process servers who were attempting to serve restraining notices and writs of garnishment, while she transferred millions of dollars of the fraudulently conveyed assets to more than *fifteen* different bank accounts that she had established and over which she maintained dominion and control, as she

---

[2] In the New York proceedings, Meir admitted that Bartolacci actively and knowingly participated in the couple's judgment evasion scheme.  It is believed that DHC, and Pankaj Malik, Bartolacci's former attorney in the New York turnover proceedings, will testify as to Bartolacci's knowledge and participation in the transfer and dissipation of the fraudulently conveyed assets. Bartolacci waived any claim of attorney-client privilege in the New York proceedings with respect to their communications with her.

withdrew hundreds of thousands of dollars in cash from the accounts; (iv) Meir initiated gold bullion transactions of approximately $1.8 million, paid for by Bartolacci, and the gold bars were sent to Bartolacci at her Miami Beach rental property (and have never been accounted for); (v) Bartolacci met with DHC attorneys in Florida, without Meir, to execute a trust instrument that was designed to defraud YH; and (vi) Bartolacci moved and then re-concealed an expensive wine collection that Meir had amassed with part of the fraudulently conveyed assets to intentionally evade orders of attachment.

9.      Bartolacci was an active and willing participant in the Meir-Bartolacci shell game of shifting assets, as she knowingly opened and closed bank accounts in multiple jurisdictions one step ahead of YH's collection efforts and coordinated asset transfers with Meir.

10.     Bartolacci knowingly assisted in concealing and dissipating the fraudulently conveyed assets, to evade and impede YH's enforcement of its judgment.  None of his could have happened without Bartolacci's assistance.[3]

**B.   Procedural Background – The New York Turnover Action**

11.     On February 10, 2022, YH commenced a New York Supreme Court turnover proceeding, captioned *YH Lex Estates LLC v. Meir, et al.*, Index. No. 151267/2022 (the "Bartolacci Turnover Action"), with the permission of Justice Joel M. Cohen ("Justice Cohen"), the presiding judge in the *YH-Meir Action*.

---

[3] It is not a defense for Bartolacci to claim, as she has in the New York proceedings, that she merely did what Meir asked her to do.  All the harm to her creditors and years of wasteful litigation could have been avoided but for Bartolacci's fraudulent conduct.  Her after-the-fact (i.e., after the money ran out), matrimonial-lawyer orchestrated, self-portrayal as an "innocent spouse", requiring Bartolacci to incessantly lie under oath and to selectively misremember what happened, has created a uniquely disturbing record, vexatiously multiplying the costs and burdens to the judicial system and to Bartolacci's creditors, beyond reason and credibility.  One does not innocently open fifteen new bank and financial accounts, as Bartolacci did, while receiving notices that accounts were being closed by banks for suspicious activity.  Bartolacci's repugnant ruse – an offense to truly innocent spouses --- should be penalized with appropriate relief, requested herein.

12.     On May 3, 2022, Justice Cohen entered summary judgment in favor of YH (the "Summary Judgment Order") in the *Bartolacci Turnover Action*.  Judgment was thereupon entered against Bartolacci and Ermitage in the amount of $13,903,573.02 (the "Bartolacci Judgment").

13.     After Bartolacci and Meir were evicted from Bartolacci's $150,000 per month Miami Beach rental property, the couple separated in the spring of 2023.  Bartolacci then expended millions of dollars, funds that she now alleges were part of an approximately $6-million borrowing from her father – but which, upon information and belief, as alleged herein, were concealed trust distributions to Bartolacci.

14.     Part of these funds were expended by Bartolacci in her effort, nearly 18 months after entry of the Bartolacci Judgment, to vacate the Bartolacci Judgment and the Summary Judgment Order.  Bartolacci was partially successful in that Justice Cohen vacated the Bartolacci Judgment (which had been previously affirmed by the New York State Appellate Division) and scheduled a hearing to determine whether the equities required adjustment of the value of damages to be imposed on Bartolacci because she had transferred some of the assets back to Meir.

15.     Justice Cohen denied Bartolacci's motion to vacate the Summary Judgment Order, affirming Bartolacci's liability under the Bartolacci Judgment.  Thus, the only issue remaining to be determined in the Bartolacci Turnover Action was the amount in which the judgment against Bartolacci would be reinstated.

16.     In her attempt to vacate the Summary Judgment Order, Bartolacci disavowed her many prior affidavits and deposition testimony, admitting for the first time that she had not, in fact, provided reasonably equivalent value for the fraudulent transfers and that her prior deposition testimony was false.  Bartolacci further claimed that she had been under the sway of deceptive lawyers.  Bartolacci falsely alleged that she had never hired the attorneys in question.

17.     Having failed in her gambit to paint herself as an innocent spouse, and with YH's request to hold that hearing in September 2024 pending, Bartolacci filed her personal bankruptcy petition in this Court on August 30, 2024.

18.     Upon information and belief, Bartolacci strategically timed her instant voluntary bankruptcy filing to prevent Justice Cohen from making a final ruling and entering a final Judgment against Bartolacci, which would inevitably have been entered against Bartolacci, either in the original amount of the Bartolacci Judgment or, potentially, in a modestly reduced amount. This also precluded the Appellate Court from hearing YH's appeal seeking to reinstate the Bartolacci Judgment consistent with its earlier decision upholding the judgment.

19.     Notably, in the *YH-Meir Action*, in her initial defense of their fraud scheme, Bartolacci claimed that judgment should not be entered against her because she had provided reasonably equivalent value, as initial transferee, for the fraudulent transfers she and Ermitage received from EZL Meadow Lane LLC ("EZL") and EAM Meadow Lane LLC ("EAM"), the entities they claimed owned the $44 million mansion in the Hamptons. Bartolacci further testified at a deposition in June 2022 that she freely spent millions of dollars of the Fraudulently Conveyed Assets and willingly gave Meir access to some of the post-transfer funds.

20.     Bartolacci now claims to be virtually penniless and has virtually no non-exempt property, despite having had access to and then, dissipating more than $12.5 million of Fraudulently Conveyed Assets and spending another $6 million since November 2022 that she claims was "loaned" to her by her father. Upon information and belief, these funds have been provided to Bartolacci by her father through millions of dollars of trust distributions that have been disguised as "loans", which appear not to ever pass through Bartolacci's bank accounts, further evading her personal creditors. Thus, despite having been handed more than $17.5 million in the past four years, Bartolacci purports

to have nearly $0 in the remaining bank accounts she personally maintained as of her bankruptcy petition. Bartolacci nevertheless continues to lead a lavish lifestyle spending nearly $40,000 per month.

21.     Bartolacci is not the type of debtor who should be entitled to use the bankruptcy process to obtain a discharge of her debts – at least not the debt owed to YH. The "fresh start" policy the bankruptcy process affords to honest, but unfortunate, debtors does not apply, nor should it extend to Bartolacci. Bartolacci is no innocent spouse.

## BASIS FOR RELIEF

22.     This adversary proceeding (the "Adversary Proceeding") is brought pursuant to sections 523(a)(2) and (6) and 727(a) (2)(A), 727(a)(4)(A) and 727(a)(5).

## JURISDICTION

23.     This Adversary Proceeding relates to the bankruptcy case of In re Ranee A. Bartolacci, Debtor, Case No. 24-18942 (Bankr. S.D. Fla. Aug. 30, 2024) (the "Bankruptcy Case"), which is pending under chapter 7 of the Bankruptcy Code in the Bankruptcy Court before the Honorable Robert A. Mark.

24.     This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157, 1331 and 1334.

25.     Plaintiff consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

13559119-7

27.     On August 30, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").

## PARTIES

28.     The Plaintiff is a limited liability company organized in the State of New York which maintains its principal place of business care of Andrew Heymann, Esq., Solomon Blum Heymann LLP, 40 Wall Street, 35th Floor, New York, New York 10005.  The Plaintiff is beneficially owned by Yoav Harlap ("Harlap").

29.     The Defendant is an individual who maintains a residence at 501 NE 31st Street, Unit 1506, Miami, Florida 33137.

30.     On or around September 4, 2024, Robert A. Angueira (the "Trustee") was appointed interim chapter 7 trustee of the Debtor's estate.  The Trustee is a member of the panel of private chapter 7 bankruptcy trustees in this district established by the United States Trustee pursuant to 28 U.S.C. § 586(a)(1).  The Trustee is the duly appointed permanent chapter 7 trustee of the Debtor's estate.  The Trustee maintains an office for the conduct of business at 16 SW 1st Avenue, Miami, Florida 33130.  On October 10, 2024, the Trustee presided over the first meeting of creditors in the Debtor's case and became the permanent trustee herein by operation of section 702(d) of the Bankruptcy Code.

## FACTS COMMON TO ALL CAUSES OF ACTION

I.      **YH's Pre-Petition Legal Proceedings Against the Debtor**

31.     On June 5, 2021, YH obtained the Meir Judgment in the *YH-Meir Action*, which YH commenced against, among others, the Debtor's now ex-husband, Meir, in the sum of $19,742,959.81.  The Meir Judgment has continued to accrue interest and fees since its date of entry.

9

32.     The Meir Judgment was based on Meir's breach of a $20 million personal guaranty of monies YH loaned to HFZ between May 15, 2017, and May 3, 2019, pursuant to a multi-tranche convertible loan reflected in a series of promissory notes, with respect to a potential mixed residential/commercial development project on the Upper East Side of Manhattan.

33.     After HFZ failed to repay the promissory notes as they matured, Meir and Feldman provided personal guaranties to YH in November 2019 and provided a restated personal guaranty to YH in July 2020.

34.     When HFZ was unable to repay the notes according to the parties' amended agreement, YH sent a series of default notices to Meir, dated August 12, 2020, August 24, 2020, September 1, 2020, October 18, 2020, and October 30, 2020, advising him of his absolute, unconditional liability under his personal guaranty and that a lawsuit would be filed against Meir imminently.

35.     Notwithstanding the numerous default notices to HFZ and Meir, as personal guarantor, no further payments were forthcoming.

36.     On November 3, 2020, YH commenced the *YH-Meir Action* against Meir to compel payment of the YH debt, by motion for summary judgment in lieu of complaint pursuant to New York law, CPLR §3213, with respect to Meir's personal guaranty.  That action resulted in the entry of the Meir Judgment.

37.     The sale of 40 Meadow Lane closed on April 5, 2021, during the pendency of the *YH-Meir Action*, shortly before entry of the Meir Judgment.  In the *YH-Meir Action*, Bartolacci fraudulently claimed to own 95% of the entities that owned 40 Meadow Lane.

13559119-7

## II.    Ownership of 40 Meadow Lane

38.    Meir originally entered the contract to purchase 40 Meadow Lane in his own name. Meir claimed that HFZ helped him purchase the property as part of his compensation.

39.    Before closing the purchase, HFZ's attorneys formed a Delaware limited liability company named EAM to hold title to 40 Meadow Lane.  Under EAM's original limited liability company agreement, dated as of June 2013, HFZ was the sole member.

40.    However, on December 30, 2013, HFZ then transferred 50% of its ownership interest in EAM to Meir.  That same day, EAM amended its limited liability company agreement in a document titled, "Second Amended and Restated Limited Liability Company Agreement", dated as of December 30, 2013, to reflect that it was now owned equally by Meir and HFZ.

41.    On March 5, 2019, EZL was formed under the laws of Delaware on Meir's behalf by HFZ's attorneys to own and hold membership interests in EAM.  Pursuant to the EZL operating agreement dated March 21, 2019 (the "Original EZL Operating Agreement"), Meir was the sole member of EZL.

42.    On March 21, 2019, Meir transferred his 50% ownership interest in EAM to EZL, while HFZ concurrently transferred 45% of its remaining 50% ownership interest in EAM to EZL, presumably as compensation to Meir, rendering Meir the 100% owner of EZL.

43.    That same day, EAM amended its operating agreement to reflect that it was now owned 95% by EZL and 5% by HFZ.  Thus, through EZL, Meir was the 95% beneficial owner of 40 Meadow Lane and the Managing Member of EAM.

44.    Thereafter, HFZ transferred its remaining 5% of EAM directly to Meir's individual name, rendering Meir the 100% beneficial owner of all rights, title and interest in and to 40 Meadow Lane.

45.     Relying on the foregoing transfers and the Original EZL Operating Agreement, Meir repeatedly declared and represented to others that he was the sole beneficial owner of 40 Meadow Lane, including in court filings, in real estate transaction documents, in verified statements to tax authorities, in sworn settlement agreements and in indemnity agreements.

46.     Nevertheless, as part of Meir and Bartolacci's interspousal fraudulent conveyance scheme, and contrary to the overwhelming record of evidence, Meir and Bartolacci created a sham second EZL Operating Agreement, dated March 21, 2019, which alleged that Bartolacci owned 95% of EZL and which Bartolacci personally signed (the "Sham EZL Operating Agreement"), to justify Meir's transfer of almost the entirety of the net sale proceeds of 40 Meadow Lane to Bartolacci.

47.     In furtherance of this scheme, Bartolacci filed a forum-shopping action in Florida captioned *Ranee Bartolacci v. YH Lex Estates LLC et* al. (Case No. 2021-025805-CA-01), which is still technically pending in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "Florida Declaratory Judgment Action"), in which she sought to declare that the Sham EZL Operating Agreement was valid, in a transparent effort to avoid the New York Supreme Court's evidentiary hearing scheduled for January 31, 2022.

48.     Following the aforementioned January 31, 2022 hearing, the New York Supreme Court concluded that Meir was the true beneficial owner of 40 Meadow Lane, notwithstanding Bartolacci's assertions to the contrary.

49.     The New York Supreme Court further determined that Meir was judicially and equitably estopped from challenging his 100% ownership of 40 Meadow Lane, despite Meir and Bartolacci's audacious plan to conceal Meir's ownership through their sham "transfer" of EZL to Bartolacci.

### III.    The Fraudulent Transfer Scheme

50.     While the decision to grant summary judgment to YH was pending in the *YH-Meir Action*, Meir and Bartolacci embarked on a series of fraudulent transactions to Bartolacci, directly and through Bartolacci's entity, Ermitage, designed to secrete millions of dollars away from New York and to obstruct YH's ability to satisfy its imminent judgment against Meir.

51.     Meir and Bartolacci's effort to evade the Meir Judgment began in March 2021, and involved, at first, a series of undisclosed fraudulent transactions between them related to 40 Meadow Lane.

52.     On March 24, 2021, YH's counsel wrote to DHC: "[W]e recently learned that your client Nir Meir has stipulated to the dismissal of a notice of pendency filed in the EAM 40 Meadow Lane LLC matter in Suffolk County Supreme Court.  Please respond as soon as possible confirming that your client Mr. Meir has not, and will not during the pendency of our case against him, assign, dispose of, encumber, or otherwise transfer his direct or indirect interest(s) in the 40 Meadow Lane property. We reserve all rights."

53.     DHC failed to respond and, during the week of their silence, worked with Meir and Bartolacci to form Ermitage (New York).

54.     Absent any response, YH made application to the New York Supreme Court by order to show cause, on March 30, 2021, requesting a temporary restraining order and order of attachment (the "TRO Proceeding") with respect to the sale of 40 Meadow Lane.

55.     A hearing was held on the TRO Proceeding on March 31, 2021.

56.     During the TRO Proceeding, the New York Supreme Court was troubled that the money from the sale of an asset valued more than $43 million might not be available to satisfy YH's then imminent judgment (summary judgment argument was to be held days later).  To assuage the

Court's concerns, Meir, through DHC, represented and assured the Court that the net sale proceeds would remain available to satisfy any judgment.

57.     Expressly relying, in part, on Meir's counsel's representations, as officers of the court, the New York Supreme Court denied YH's request for a TRO.

58.     Post-judgment discovery revealed that the representations made by DHC to the New York Supreme Court were misleading.  Contrary to their representations to the Court, Meir and DHC were, at that very moment, assisting Meir and Bartolacci in their efforts to transfer the net sale proceeds from the sale of 40 Meadow Lane (*i.e.*, the Fraudulently Conveyed Assets) to Bartolacci and Ermitage.

59.     Despite Meir's counsel's representation to the court on the record at the TRO Proceeding that the sale of the 40 Meadow Lane was only "a contemplated sale [and that t]here is no specific timetable established yet," the truth was that DHC had attempted to close the sale transaction (together with the sale of its $1 million in personal property contents) that *very same day* but were unsuccessful in doing so because they had provided the title company and the purchaser's attorney with contradictory information about Bartolacci's ownership of 40 Meadow Lane, including the existence of the Sham EZL Operating Agreement.

60.     The very next day, DHC, admitted to HFZ's counsel that the timing of the sale was no coincidence.  On April 2, 2021, HFZ's counsel disclosed: "You also admitted that you need to close by Monday, not because the buyer will walk, but because your client wants to take the money before a judgement is entered against him [Meir] on Tuesday in the YH matter.  Intent to defraud creditors? Aiding and abetting?"

61.     The rushed closing of the sale of 40 Meadow Lane was for the express purpose of engaging in a series of fraudulent and voidable transactions between Meir and Bartolacci with the

intent to hinder, delay, and defraud YH as Meir's creditor.  Despite counsel for HFZ's accurate warning that DHC was aiding and abetting the plan to defraud YH, the closing was held on April 5, 2021, for a total purchase price of $44,009,900, while YH's attachment application was pending before the New York Supreme Court.

62.     Had corporate formalities been properly observed, they were not, the balance of the net sale proceeds, after satisfying the claims secured against 40 Meadow Lane, should have been deposited in EAM's bank account to satisfy its creditors.  Then, once EAM's creditors were satisfied, the remaining net sale proceeds of 40 Meadow Lane should have been distributed, in turn, to EZL as the 100% owner of EAM.  Only after EZL's creditors were satisfied would either Meir or Bartolacci (assuming her claimed ownership of 40 Meadow Lane was authentic) receive a distribution from EZL.

63.     However, neither EAM nor EZL received any of the net sale proceeds from 40 Meadow Lane.  Rather, in lieu of following the corporate formalities, almost the entirety of the net sale proceeds was distributed to Bartolacci and Ermitage.

64.     YH therefore commenced the *Bartolacci Turnover Action* in New York Supreme Court before the same judge presiding over the *YH-Meir Action*.

65.     YH was granted summary judgment in the *Bartolacci Turnover Action*; the court found that the second EZL Operating Agreement was a sham.

66.     On May 25, 2022, the New York Supreme Court entered the Bartolacci Judgment against the Debtor and Ermitage in the total amount of $13,903,573.02.

67.     Notwithstanding Bartolacci's prior claim in affidavits and at her deposition that she owned EZL and EAM, Bartolacci has not disclosed any ownership interest in either EZL or EAM on

her Schedules of Assets and Liabilities ("Schedules"), as amended, filed in this case [ECF Nos. 16 &

23].

## IV.    The Debtor and Ermitage's Intentional Violation of Restraining Notices, Garnishments and Attachments

68.    Bartolacci and Ermitage, of which Bartolacci was the sole member, and which

Bartolacci testified that she controlled, received and dissipated the Fraudulently Conveyed Assets.

69.    On April 5, 2021, $2 million from the 40 Meadow Lane sale was wired to Ermitage,

which had no right, title or interest in or to EAM, EZL, or 40 Meadow Lane.

70.    Neither Bartolacci nor Ermitage provided any economic value to Meir, EAM or EZL

for their receipt of this $2,000,000 cash distribution to Ermitage.

71.    Thereafter, Bartolacci worked with DHC to merge the New York Ermitage into a

Florida-successor Ermitage, as a cornerstone of Bartolacci and Meir's interspousal fraud scheme,

providing themselves with a means to hide the remaining proceeds of the sale of 40 Meadow Lane

and moving the assets outside the jurisdiction of the New York courts and YH's reach.

72.    The wire transfer to Ermitage of $2,000,000 was a fraudulent and voidable

transaction.

73.    Bartolacci did not provide any economic value to Meir, EAM or EZL, for her receipt

of $10,587,387.52 from the sale of 40 Meadow Lane.  Bartolacci had no right, title, or interest in or to

EAM, EZL or 40 Meadow Lane, and did not provide any value for the transfer, notwithstanding her

execution of the sham EZL Operating Agreement and her commencement of a Florida Declaratory

Judgment Action claiming to own such interest.

74.    The wire transfer to Bartolacci of $10,587,387.52 was a fraudulent and voidable

transaction.

13559119-7

75.    In further support of their scheme, Bartolacci executed sworn affidavits and provided deposition testimony in which she claimed to have provided reasonably equivalent value for the fraudulent transfers and her claim to ownership of 95% of EZL, all of which was knowingly false.

76.    Bartolacci was aware of the mounting debts that Meir and Bartolacci were facing when she embarked on the Meir-Bartolacci judgment-evasion fraud scheme.  Her contention that she was unaware of their debts is false.  For example, on December 7, 2020, Stacey Cooper, a friend of Meir and Bartolacci, and the wife of another HFZ creditor, demanded repayment of amounts she had loaned to Meir and Bartolacci, stating: "Nir and Renee I cherish our friendship and I feel terrible that I have not heard back from you about the money I lent you.  **I have not done any business with you I lent you as friends money and I want to have it retuned right away it was taken from my account as a favor to you and Benny and it's way past what you said and I'm really upset.**  Please call me to let me know when you will be returned the money I lent you.  Stacey." (Emphasis added).

77.    Bartolacci also knew that the IRS had filed a tax lien against her and Meir in the amount of $834,313.52 on March 6, 2021.

78.    In an affidavit Bartolacci submitted in the *Bartolacci Turnover Action*, she averred: "I never was told about the fraudulent conveyance claims against me, and no one ever explained them to me."  Bartolacci further claimed that she only learned about these matters on March 3, 2023, after she was evicted from her Miami Beach rental property.  These statements were knowingly false.

79.    Documentary evidence proves that Bartolacci knew about the claims against her and Meir from as early as the summer of 2021 and nevertheless continued to dissipate the Fraudulently Conveyed Assets.  Among other things,

    (a) Bartolacci was served with a restraining notice on June 15, 2021.

13559119-7

(b) After Meir's motion for an emergency stay was lifted in mid-July 2021, counsel for YH again emailed Bartolacci a restraining notice, a copy of the Meir Judgment, and subpoenas. By these documents, Bartolacci was notified that she was prohibited from dissipating the fraudulently conveyed assets. The email was also sent to Bartolacci's counsel at DHC.

(c) On July 26, 2021, Hutcher wrote to Chase with respect to subpoenas that had been served by YH stating: "I am Senior Counsel at Davidoff Hutcher & Citron LLP, attorneys for defendant/judgment-debtor Nir Meir and Non-Parties/Non-Judgment-Debtors Ranee Bartolacci [and Ermitage]."

(d) On August 6, 2021, Richard Wolter, an attorney at DHC, communicated with both Meir and Bartolacci, providing a draft of Bartolacci's objections and responses to the information subpoena and subpoena duces tecum that had been served on Bartolacci with the restraining notice.

(e) On August 13, 2021, DHC served objections and responses on behalf of Bartolacci to the subpoenas that had been served on Bartolacci. Bartolacci's signature on her response to the information subpoena was notarized. Bartolacci responded to each request with an objection to personal jurisdiction.[4]

(f) On Friday, August 13, 2021, a process server again served the June 15, 2021, restraints and notifications on Bartolacci. Bartolacci was informed by her property manager that a man showed up at the gate and wanted Bartolacci to sign "legal papers". He "told him no one home and no speaky English….. He left." Bartolacci responded: "Lol, Ok".

(g) On Saturday, August 14, 2021, when the process server rang the intercom, Bartolacci rushed her son into the house to hide from the process server. Bartolacci's car was in the driveway.

(h) On August 14, 2021, Bartolacci sent a picture via text to Meir, from the expensive security system cameras she had installed at the rental property, while the process server was ringing the bell, texting: "U have a friend. Or do I. Lol."

(i) On August 17, 2021, YH's process server again effectuated personal service of restraining notices on Bartolacci at her Miami Beach rental property.

---

[4] Bartolacci located and arranged for Gabriel Albelo, a mobile notary, to notarize her signature and Meir's signature on their objections. Thereafter, Bartolacci regularly arranged for Mr. Albelo to visit her Miami Beach rental to notarize their signatures. Bartolacci was not a passive observer to the fraud scheme.

(j) On August 18, 2021, HFZ made personal service on Bartolacci of a 53-page complaint alleging that she, Meir, and Ermitage had engaged in massive financial fraud. Bartolacci's name is referenced in the amended complaint forty-eight times (not including the caption), accusing her of theft, looting and dissipating tens of millions of dollars.

(k) Placing Bartolacci on further notice of the claims against her and Meir, YH's Florida counsel personally served Bartolacci on September 28, 2021, with a deposition subpoena related to domestication in Florida of the Meir Judgment.

(l) On October 5, 2021, Bartolacci filed an affidavit to quash YH's subpoenas in which she affirmed that she owned Ermitage.

(m) On October 30, 2021, Bartolacci sent Meir an image of YH's Writ of Garnishment stating, "Came in the mail." Bartolacci had actual notice that the fraudulently conveyed assets were subject to attachment.

(n) On December 6, 2021, Bartolacci forwarded to Meir the restraining notice that YH had served on her Morgan Stanley accounts. The restraining notice stated that Meir had fraudulently transferred $10,587,387.52 from the sale of 40 Meadow Lane to Bartolacci and that Bartolacci caused millions of dollars thereof to be transferred to her Morgan Stanley accounts and that she was restrained from further dissipating the fraudulently conveyed assets.

(o) On December 13, 2021, Bartolacci sent an email to Wolter at DHC, with a copy to Meir, attached to which were Bartolacci's Chase account statements for March and April 2021, to assist in the effort to quash YH's restraints and information subpoenas.

(p) On December 21, 2021, a process server visited her Miami Beach rental to serve a deposition subpoena. Bartolacci was home but refused to accept service. The process server attached the subpoena to the front gate.

(q) Process servers made multiple attempts to re-serve Bartolacci on December 28, 2021, December 29, 2021, January 3, 2022, and January 4, 2022, and, subsequent thereto.

(r) YH's Florida counsel provided a new notice of deposition to Bartolacci by first-class mail at the Miami Beach rental property, and to all counsel, including Bartolacci's Florida counsel from the offices of Vincent F. Vaccarella, P.A., as well as to her counsel at DHC.

(s) On December 28, 2021, one of her employees sent a text to Bartolacci: "Don't come by door there is some guy trying to give you paperwork – I told them parents weren't home". Bartolacci responded: "Thank u".

(t) Another process server went to the Miami Beach rental on January 17, 2022, to again serve the subpoena, and observed Bartolacci outside the front of the home. Bartolacci yelled "this is private property I will call the police." The process server identified himself and said he had a subpoena for her. Bartolacci ran inside and refused to open the glass door. The process server left the subpoena outside the door in full view of Bartolacci.[5]

(u) On January 21, 2022, in correspondence exchanged by Bartolacci's respective counsel, John Moore, and DHC, her counsel at DHC concluded that service of the subpoena on Bartolacci (in connection with the hearing scheduled in New York) was effective, even though Bartolacci had slammed the door in the process server's face. Counsel stated: "had Ranee not been home or seen the process server, we would have a better argument. However, since she saw the server and then went into the house we believe it was proper".

(v) On January 27, 2022, Bartolacci sent Meir a copy of the answer to the Writ of Garnishment that she had signed on behalf of Ermitage.

(w) On February 1, 2022, Bartolacci signed her answer to the Florida Writ of Garnishment.

(x) On March 29, 2022, Bartolacci sent an email to City National Bank in Florida objecting to their compliance with YH's bank subpoena.

(y) Bartolacci sent account information by email to her attorneys (Malik and Wolter) minutes before the start of the May 2, 2022, summary judgment hearing in the *Bartolacci Turnover Action*. At that time, Bartolacci maintained that she had provided value for the fraudulent transfers. Bartolacci informed counsel: "I just shared a file with you from my gmail. … Once u tally all that up, I'm just curious as to the numbers. :)  This is all they had online. If we need more I have to request it. Thanks so much, Ranee."

(z) On June 7, 2022, Bartolacci filed an affidavit in Florida to stay execution of the YH judgment against her. This document contradicts Bartolacci's assertion that that she had never been told that a judgment had been entered against her.

(aa) On July 15, 2022, Bartolacci filed an affidavit to prevent the turnover of funds from her accounts at Morgan Stanley in which she acknowledged that judgments had been entered against her and Meir.

---

[5] Bartolacci's Florida counsel filed two separate motions to quash claiming service was improper.

80.     Meir and Bartolacci's financial and legal woes were also regularly reported in the press, which Bartolacci monitored through Google Alerts.  Among the many articles published in The Real Deal, which Bartolacci received and monitored, was an article published on May 18, 2022, in which Hutcher reportedly stated: "Nir [Meir] had a healthy lifestyle when he was at HFZ, nothing to apologize for …  He was doing well, and his wife has elected to continue to live that lifestyle." Bartolacci's self-serving assertion that she is an innocent spouse is a felonious lie.

## V.    Bartolacci's Dissipation of the Fraudulently Conveyed Assets

81.     On March 30, 2021, the same day that YH's TRO application against Meir was denied in *YH-Meir Action,* Bartolacci opened Ermitage's Chase account ended x0193. Bartolacci uploaded her driver's license, the signed account application, and Operating Agreement and Certificate of Formation for Ermitage.  The account opening form indicated that Bartolacci was the sole beneficial owner, controller of the account, and authorized signatory. The account form further indicated that Meir was the Manager of Ermitage and was also an authorized co-signatory.  However, Meir was removed as Manager of Ermitage on May 4, 2021. The corporate resolutions authorizing the account were "docusigned" by Bartolacci and Bartolacci completed her application on March 30, 2021, at 8:34 a.m.

82.     At all relevant times, Bartolacci was aware of and controlled the Chase accounts. For example, in an email dated March 30, 2021, from Hayley Assael to Bartolacci (with a copy to Howard Presant at DHC), Ms. Assael wrote: "Hi Ranee, Thank you for sending the signed operating agreement yesterday.  You should have just received a docusign to your inbox to open the accounts here at JPM."

13559119-7

83.     On or around April 5, 2021, $10,587,387.52 of the 40 Meadow Lane net sale proceeds were wired to Bartolacci's JPMorgan Chase Bank, N.A. ("Chase") Account ending x5760.[6] Bartolacci was the only account signatory.  Bartolacci dissipated the funds down to $0 with the intent to hinder and defraud YH.

84.     On or around April 5, 2021, $2,000,000 of the 40 Meadow Lane net sale proceeds were wired to Ermitage's Chase Account ending x0193.  Bartolacci was the sole beneficial owner of Ermitage.  Bartolacci dissipated the funds down to $0 with the intent to hinder and defraud YH.

85.     On April 7, 2021, Ms. Assael emailed Meir and Bartolacci stating: "My service team will confirm the debit card.  I also suggest that we open a savings account given the sizable balance, so that a portion can be moved out of checking to be safer.  I'll have the docusign sent to Ranee.  At the same time I'll have a brokerage account opened which we will probably use in the future when we start investing."

86.     On September 30, 2021, Ms. Assael emailed Bartolacci: "Hi Ranee, I was notified that your accounts (personal and Ermitage One) that are earmarked be closed by JPM have residual cash in them, so I am emailing to remind you to please transfer the remaining funds out to another institution as soon as possible, as the firm will be closing the accounts imminently".

87.     An accounting provided by the Delaware bankruptcy Trustee, in the EAM and EZl bankruptcy proceedings, shows that the Trustee had uncovered that from the $10,587,387.52 of the closing funds transferred to Bartolacci's personal Chase account and $2,000,000 transferred to Bartolacci's Chase Ermitage account, Bartolacci made "net transfers" to Meir

---

[6] The Debtor disclosed this Chase Account on her Schedules; however, the current balance in that Account is $0.00.

totaling $3,724,690.49.    The underlying account statements reflect that Meir received 135 transfers from Bartolacci's Ermitage account, totaling approximately $3.7 million.[7]

88.    In total, upon information and belief, Bartolacci had dominion and control and operated sixteen accounts through which she transferred the fraudulently conveyed assets, including accounts at Chase, Morgan Stanley, Gemini Bank, Applied Bank, City National Bank, Regions Bank, Citizens Bank, Citibank, and American Express.

89.    Having received notice that their Chase accounts were being closed, in May 2021, Bartolacci began to take steps to open a new account at Morgan Stanley Private Wealth Management ("Morgan Stanley") in the name of Ermitage.  On June 15, 2021, Bartolacci opened an account titled "Ranee Alyce Bartolacci DBA Ermitage One LLC," account ended x4539.  Bartolacci was the sole beneficial owner and authorized signatory of the account.  Bartolacci uploaded the Amended and Restated Operating Agreement for Ermitage, which showed her as sole Member and Manager.

90.    On June 18, 2021, Bartolacci opened a Morgan Stanley personal brokerage account, account ended x4447.  Bartolacci was the sole authorized signatory of this account.  On June 21, 2021, Bartolacci sent a letter to Morgan Stanley requesting a debit card for both accounts to be sent to her at the Four Seasons Hotel at the Surf Club in Miami Beach.  From June 15 to June 17, 2021, Bartolacci began to move millions of dollars to her Morgan Stanley personal account, account ended x4447.

91.    On July 15, 2021, Bartolacci opened another Morgan Stanley account, her third at Morgan Stanley, account ended x5505 and funded it with millions of dollars from her Morgan Stanley

---

[7] Bartolacci admitted in a sworn affidavit that she authorized these transfers, at least in part, stating: "From June 1, 2021 through June 30, 2021, I authorized the transfer of $1,134,500 from Ermitage's JP Morgan bank account to [Meir's] JP Morgan account (the "Funds"). The Funds were solely the property of Ermitage, which I controlled and had total ownership of. [Meir] had no entitlement to or ownership of the Funds. … Nir handled the execution of such transactions for our family. I merely funded the family transactions for Nir to execute at my direction."

personal account, account ended x4447.  Bartolacci was the sole authorized signatory of this account as well.  Thereafter, Bartolacci routinely communicated with her bankers to move money to cover credit card payments and to confirm incoming wires of hundreds of thousands of dollars from the fraudulently conveyed assets: for example, "Per your conversation with Christina earlier, the Ermitage LLC account is expected to receive $700,000 via a wire."  "I'm expecting multiple wires. Please don't release my info".

92.     On July 12, 2021, using her New York State driver's license, Bartolacci opened a Gemini Trust Company ("Gemini") cryptocurrency account, account ended x3145, deposited hundreds of thousands of dollars and immediately begin purchasing cryptocurrency.  Bartolacci linked her Gemini account to her personal Citibank checking account, account ended x7117.  Bartolacci was the sole signatory of the Gemini account.  The "onboarding" documents for her Gemini account include a photograph Bartolacci took holding her New York State driver's license in her hand.

93.     On October 6, 2021, using her new Florida driver's license, Bartolacci opened her sixth new account since receiving the 40 Meadow Lane proceeds, at Applied Bank ("Applied Bank") in Delaware, account ended x3937.  Bartolacci was interviewed in connection with the account opening formalities on September 30, 2021, and provided the bank with a photograph of her Florida driver's license and Gas utility bill from Peoples Gas.

94.     Bartolacci's Applied Bank account was linked to Bartolacci's Gemini account and was used to support her and her family's lavish lifestyle, including the payment of hundreds of thousands of dollars of American Express card transactions.  On October 4, 2021, Bartolacci emailed her banker at Applied Bank: "Hi Lauren, Please forward me our contact number so my team can reach out to you to address any questions you have."

13559119-7

95.     Once YH's counsel discovered the existence of the Gemini account, Bartolacci liquidated that account and wired hundreds of thousands of dollars to her Applied Bank account.

96.     However, on December 31, 2021, Applied Bank notified Bartolacci that "based on enhanced documentary reviews and applicable regulatory guidelines, Applied Bank has decided to" terminate its relationship with Bartolacci.  Jessie Hayes of Applied Bank emailed Bartolacci on January 4, 2022 copies of a closing letter together with the closing bank check.

97.     Following YH's domestication of the Meir Judgment in Delaware at the end of 2021, Bartolacci moved the money yet again by making a deposit, on January 12, 2022, to a new account at City National Bank of Florida ("City National Bank"), account ended x0733, which she had opened a week earlier, her seventh new account since she had received the fraudulently conveyed assets.

98.     Bartolacci opened the new City National Bank account on January 5, 2022, at the 41st Street Banking Center at 475 Arthur Godfrey Road, Miami Beach, Florida and presented her Florida driver's license.  Bartolacci was the sole authorized signatory on the account.  Bartolacci provided a copy of her Florida driver's license and signature card to the bank.

99.     On April 28, 2022, Bartolacci received an email from City National Bank concerning transactions flagged for suspicious activity and questioning negative news articles about Meir and Bartolacci.  Bartolacci's banker confirmed a phone conversation he had with Bartolacci concerning the bank's request for additional information about the source of her funds.  On May 30, 2022, Bartolacci forwarded to Wolter the email from City National Bank informing her that the bank was closing her account.  The same day, Bartolacci copied Wolter with respect to her request that City National Bank produce her bank statements, which Bartolacci needed in connection with pending contempt proceedings against Meir.  On June 10, 2022, Bartolacci's City National Bank account was closed by the bank's BSA (*i.e.*, Bank Secrecy Act) Department.

100.    In January 2022, Bartolacci opened her eighth new account since receipt of the fraudulent conveyed assets, a personal checking account ended x3092 at Regions Bank.  On January 6, 2022, Bartolacci sent a text to Meir with the Regions Bank account information and informed him "other stuff is at home behind the desk."  From March through July 2022, Bartolacci made large cash withdrawals from her personal and Ermitage Regions Bank accounts, in person, upon presentation of her driver license.

101.    On April 20, 2022, Bartolacci opened her ninth new account since receiving the fraudulently conveyed assets, a business checking account, account ended x8949, for Ermitage at Regions Bank.  Bartolacci was the sole authorized signatory on the account.  A Regions Bank authorization form was signed by Bartolacci with the title of Managing Member.

102.    On August 26, 2022, Bartolacci opened her tenth new account since receipt of the fraudulently conveyed assets, a business checking account at Citizens Bank, account ended x3279, for RSV One LLC.

103.    On September 9, 2022, Bartolacci opened her eleventh new account since receipt of the fraudulently conveyed assets, a personal checking account at Citibank, account ended x9407.[8] Bartolacci appeared for in-person bank officer Emmanuel Celestin and signed the account opening forms.  Bartolacci was the sole authorized signatory.  Further demonstrating Bartolacci's dominion and control over the Citibank accounts, the bank statements reflect that Bartolacci made large cash withdrawals from the account.  The Citibank records further reflect that outgoing wires were confirmed by Bartolacci.

---

[8] On that same date, Bartolacci also opened her twelfth new account, a personal checking account, account ended x7159, at Capital One Bank.  This account was solely in Bartolacci's name.

104.    On September 12, 2022, Bartolacci opened her thirteenth new account since receipt of the fraudulently conveyed assets, a business checking account at Citibank, account ended x7248, for RSV One LLC.  Bartolacci was the sole authorized signatory.

105.    Bartolacci had complete dominion and control of the Ermitage accounts through which she laundered fraudulently conveyed assets.

106.    With respect to her ownership and control of Ermitage, on March 26, 2021, Bartolacci executed the Ermitage Operating Agreement as the sole member and named Meir as initial Manager and provided the Operating Agreement to Chase on March 30, 2021, to open the Chase account.

107.    Bartolacci was copied in a March 29, 2021 email with Howard B. Presant, a DHC partner, Ms. Assael, and Meir with respect to opening the Ermitage account and delivering the Ermitage Operating Agreement to Chase.

108.    On April 28, 2021, Bartolacci exchanged communications with Casey Kriedman and Brett Richter of UBS to open another Ermitage account.

109.    On or about May 4, 2021, Bartolacci executed an Amended and Restated Operating Agreement (drafted by DHC) appointing herself sole Manager and removing Meir as Manager.  Upon Meir's removal, Bartolacci had sole dominion and control of Ermitage.

110.    On July 8, 2021, DHC created a second Ermitage entity for Bartolacci in Florida. On that date, Bartolacci and Ms. Iovino of DHC exchanged emails to complete the documents necessary to form Ermitage (Florida).  Meir was not copied on these emails.

111.    Between July 23, 2021, and July 28, 2021, Bartolacci exchanged at least fourteen emails with DHC partners Howard B. Presant and Steven Sedereas, and Ms. Iovino with respect to the New York-Florida merger.  Meir was not copied on these emails.

112.    On July 29, 2021, DHC completed the merger of Ermitage (New York) into Ermitage (Florida) for Bartolacci.

113.    On August 17, 2021, Bartolacci worked with Ms. Iovino and Vernon Jefferson of DHC to obtain a new EIN for Ermitage.

114.    The following day, August 18, 2021, Ms. Iovina asked Bartolacci to sign the last page of Articles of Organization and Operating Agreement for another entity, RAB Two LLC "as you have with Ermitage One LLC".

115.    On August 25, 2021, Bartolacci returned to Ms. Iovino the signed Operating Agreement for RAB Two LLC.  Bartolacci was the sole authorized member of this entity.   Meir was not copied.

116.    Upon information and belief, Bartolacci initially formed RAB Two LLC for a proposed investment of fraudulently conveyed assets through Beliade, a financial services firm that invests in consumer brands.  Bartolacci emailed Beliade: "Hi Whitney, I just received this [subscription agreement] from my lawyer.  Please confirm that is ok prior to me signing the document so I can sign and initiate the wire on my end. Thank you. Ranee".  On September 17, 2021, Ms. Williams confirmed that the subscription agreement was in order, and that Bartolacci was committing $500,000.  Bartolacci responded several hours later: "Hi Whitney, I will have document to u end of day as I'm out for holiday.  Wire will be processed Monday morning. Have a great weekend.  Ranee".

117.    Meanwhile, on August 19, 2021, DHC formed another entity for Bartolacci, RSV One LLC, and filed Bartolacci's signed Articles of Organization with the Florida Secretary of State.  Bartolacci was the sole Authorized Member of this entity.

118.    On September 9, 2022, DHC assisted Bartolacci in forming another Florida entity, RSV Three, LLC, with Bartolacci as the sole Member and Manager.

119.    Ultimately, Bartolacci ensured that all the Fraudulently Conveyed Assets, more than $12.5 million, disappeared, including knowingly laundering approximately $3.7 million of funds back to Meir.

120.    Meir and Bartolacci's cycle of transactions—from the net sale proceeds from 40 Meadow Lane to Bartolacci, individually, and to Ermitage, beneficially owned by Bartolacci, and then in some instances back to Meir for his own use, all under concealment, lacked economic substance and was intended by Bartolacci to evade the Meir Judgment.  These coordinated transfers between spouses were designed to avoid having EAM transfer the 40 Meadow Lane Property net sale proceeds directly to their true beneficial owner, Meir, and, thus, avoiding such funds being subject to the Meir Judgment, while still permitting Meir and Bartolacci use and enjoyment of the Fraudulently Conveyed Assets.

121.    In collaboration with Meir, the monies fraudulently transferred to Bartolacci were diverted, for among other purposes, to purchase cryptocurrency through the Gemini account, gold bullion, investment grade wine, and investment vehicles, to hide these "movable" assets, in defiance of court orders and YH's judgment enforcement efforts, which could not have been accomplished without Bartolacci's active and knowing involvement.

122.    Notwithstanding the Meir Judgment, and the restraining notices and orders of attachment and garnishment, Bartolacci continued to live lavishly, in one such example, taking a short trip to Europe at a cost of more than $30,000 (not including airfare), paid for with the fraudulently conveyed assets.  Evidencing her coordination of spending the fraudulently conveyed assets, on the eve of the trip to Europe, Bartolacci told Meir she was taking cash from one of her accounts, stating

"I'm transferring 20k" "And taking 8k in cash" "Told me the 10 will be there by the end of the day or tomorrow or to come back." To which Meir replied, "You don't need to transfer 20 as we already transfer 40K today".

123.    Upon information and belief, Bartolacci dissipated most of the Fraudulently Conveyed Assets, knowing full well that YH was seeking to attach these funds and enforce its judgments.  At the same time, Bartolacci hid from process servers, to evade service of restraining notices and writs of garnishment.

124.    Even after Meir's accounts were frozen, Bartolacci allowed Meir to utilize her American Express account and thereby access the Fraudulently Conveyed Assets.  For example, the following texts were exchanged by Bartolacci and Meir on November 1, 2021, at 8:14-8:21pm:

> NM:    "Mama, can u send me the front and back of your Amex. Thanks".
>
> RAB:    "Nope. U didn't even tell me where u where going or who with? Into the water hole u go"
>
> NM:    [sent a GIF - picture of dog]
>
> RAB:    [Attached photos of Amex Platinum card ended – 76005]

125.    Until their separation in May 2023, Bartolacci and Meir colluded in this scheme to ensure that the Fraudulently Conveyed Assets were held outside of the reach of their creditors, particularly YH.  Upon information and belief, in furtherance of this scheme, Bartolacci, directly and through Ermitage, controlled no fewer than sixteen (16) bank accounts which received and disbursed the fraudulently transferred proceeds outside the reach of YH.

126.    As part of her active participation in this scheme, Bartolacci visited banks in person and personally instructed the banks to wire millions of dollars from account to account and confirmed

the wires to the banks.  Bartolacci also visited the banks on multiple occasions to withdraw or directly transfer hundreds of thousands of dollars in cash from her accounts.

127.    Bartolacci continued to use her bank accounts to support herself and her husband with the Fraudulently Conveyed Assets even after receiving notices that her accounts were being closed for suspicious activity.  Notwithstanding those notices, Bartolacci took steps to open new accounts and to transfer the funds to these new accounts, one step ahead of writs of garnishment that Bartolacci received.

128.    In coordination with DHC, and shortly after being served with YH's August 2021 restraining notice with respect to the Meir Judgment, Bartolacci sought to create and fund the Ranee Bartolacci Family Trust of 2021 (the "Ranee Family Trust"), under Florida law, for herself and her children.  While Bartolacci now claims to have no relationship with DHC,[9] Bartolacci drove from her Miami Beach rental property to West Palm Beach to meet with an attorney from DHC at the bank branch to review and execute the Ranee Family Trust; her signature was notarized in the presence of a bank officer.  Meir was not present for this meeting.  Bartolacci handled this on her own as part of their fraud scheme to conceal funds from YH and other creditors.

129.    Evidencing Bartolacci's knowledge of the claims that had been made against her and Meir, on November 30, 2022, Bartolacci deposited $650,000 that she received from her father, Raymond A. Bartolacci, Jr. ("Ray Jr."), as a purported loan, in her Citibank account.  Bartolacci wired

---

[9] In the *Bartolacci Turnover Proceeding*, Bartolacci fraudulently claimed that she never met Hutcher.  This was another lie. Bartolacci was represented and/or assisted by DHC and Hutcher, directly and indirectly, in several legal matters from March 2021 through March 2023, at which time Bartolacci sent the following text to Hutcher:

"Morning, Please lmk what time I can meet u. Short and quick. I know u have done a lot for me and the kids and I greatly appreciate.  I'm in Jupiter so I can drive down to hard rock (that is the guitar hotel. correct) whenever is convenient for u. Thank u so much larry."

Bartolacci and Hutcher were clearly not strangers.  Indeed, in her November 1, 2021 text to Meir, while communicating about wires into the Ermitage account at Morgan Stanley, Bartolacci stated: "I love Larry."

$600,000 thereof to Meir's new attorney so that he could cure a pending contempt motion related to their scheme. Bartolacci then separately wired $50,000 to the same attorney for payment of Meir's legal fees.

## VI.    Bartolacci's Participation in the Fraudulent Transfer of Luxury Automobiles

130.    After the New York Supreme Court's decision on YH's summary judgment motion on April 12, 2021, and before the Clerk's entry of the Meir Judgment on June 15, 2021, Meir and Bartolacci coordinated other fraudulent and, thus, voidable transactions with respect to their fleet of luxury cars.

131.    Once the Meir Judgment was entered, Meir and Bartolacci attempted to secretly auction the luxury cars through eBay and small car brokers located in New Jersey and California.

132.    On October 20, 2021, DHC formed RSV One Investments LLC, in Nevada, for Bartolacci. Bartolacci was the sole Member and Manager of this entity.

133.    Upon information and belief, Bartolacci formed RSV One Investments LLC, with the assistance of DHC, for the purpose of transferring the title of three Porsches Bartolacci owned and held in the name of Ermitage to this new entity. DHC communicated directly with Bartolacci concerning these transactions: "Good afternoon Ranee, Please sign each document and return to me. Let me know if you have any questions".[10]

134.    The luxury vehicles, which Meir fraudulently transferred to Bartolacci and/or Ermitage or RSV One, LLC, and which Bartolacci, either directly or through Ermitage, then liquidated to cash for her and husband's personal benefit, include *but are not limited to* the following:

---

[10] Bartolacci testified at her deposition that the luxury cars were her personal "investments": "I have cars in my name. They're investments…. The cars are my—I trust my husband with the cars and—you know, we talk about it. I trust his take on it, and that's how we do it. He advises me on it. That's it." She further testified at her deposition that she sold the cars, relying on Meir's advice.

13559119-7

- <u>2010 blue convertible Aston Martin</u>.

- <u>2001 Mercedes-Benz G500 Cabriolet</u>.

- <u>2018 Porsche GT2</u>: This Porsche was purchased on the day of the closing of the sale of 40 Meadow Lane and then purportedly re-registered to Ermitage, for no consideration, on May 14, 2021.

- <u>2019 Porsche 911</u>: This vehicle was also re-registered in the name of Ermitage, for no consideration, on May 14, 2021.

- <u>2021 Mercedes-Benz GLS63 AMG</u>: This vehicle was purchased in the name of Bartolacci from the 40 Meadow Lane net sale proceeds that were fraudulently conveyed to her by Meir.

135.    Bartolacci did not disclose ownership of any vehicles as of the Petition Date.

136.    On her Schedules, Bartolacci claims to be in the possession of a 2012 Porsche Cayenne, valued at $14,000, which she alleges belongs to her father.

137.    Other than her father's car, the only reference to vehicles on Bartolacci's amended SOFA, is the reference to a transfer, on July 17, 2023, of the 2021 Mercedes Benz GLS63 for $90,000 to Florida Performance Cars.  Upon information and belief, this vehicle was purchased using fraudulently conveyed assets.  Bartolacci disclosed on her bankruptcy Schedules that most of the proceeds of the sale of this vehicle ($86,399.15) were used to pay Mercedes Benz Financial Services.

138.    On August 5, 2021, Bartolacci signed a Vehicle Storage Agreement between CarSafe Storage Inc. in Florida and Ermitage One LLC for a 2018 Black Porsche and a 2014 Mercedes. [11]

---

[11] On May 3, 2021, less than a month after the sale of 40 Meadow Lane and shortly before the judgment was entered against her husband, Bartolacci also executed a wine storage rental agreement with Store Self Storage in Palm Beach Gardens, Florida.  On June 9, 2021, Bartolacci received one pallet of wine and, on June 14, 2021, thirty-four boxes of wine into the storage room.  Then, on November 25, 2022, just before a scheduled contempt hearing against Meir, Bartolacci authorized Store Self Storage to deliver a key to Meir's driver, David Bond, so that he could have access to the wine storage facility.  As a result, Bartolacci knowingly enabled an expensive wine collection to be removed from the facility and shipped elsewhere to avoid the wine being collected and sold to partially satisfy the Meir Judgment.

139.     When some of the luxury cars were sold, Bartolacci's account at City National Bank, which she controlled, received incoming wires totaling hundreds of thousands of dollars.

## VII.    Bartolacci's Bankruptcy Case

140.     On the Petition Date, the Debtor commenced this bankruptcy case by filing her bankruptcy petition (the "Petition") [Docket No. 1].

141.     Following entry of an order approving the Debtor's motion requesting an extension of time file schedules, the Debtor filed her Schedules and Statement of Financial Affairs ("SOFA") on September 20, 2024 [Docket No. 16], nearly one month after the Petition Date.

142.     On October 10, 2024, the Debtor testified at the Meeting of Creditors held pursuant to 11 U.S.C. § 341 (the "341 Meeting") and the Trustee closed the meeting that same day.

143.     On October 17, 2024, following the 341 Meeting, the Debtor filed amended Schedules and SOFA [Docket No. 23].

144.     On November 6, 2024, YH filed a proof of claim as Claim #1 on the claims register for the Debtor's case in the amount of $12,587,387.52 (the "YH Claim").

### Debtor's Misrepresentations and Omissions

145.     The Debtor disclosed on her Schedules that her interest in Ermitage is "unknown" and that it was opened by her ex-husband, Meir.  However, upon information and belief, the Debtor was actively involved in establishing Ermitage in both New York and then Florida as a recipient of fraudulent conveyances from the net sale proceeds of 40 Meadow Lane to herself and Ermitage.

146.     The Debtor also disclosed her 19% interest in a limited partnership known as Bart 8 LP; however, the Debtor listed the value of her ownership interest as "unknown".  Upon information and belief, Bart 8 LP does not have a business purpose, but is used for investment management.  The

34

Debtor is aware of and knows how to obtain the liquidation value of her interest in Bart 8 LP, which, upon information and belief, is 19% of more than $10 million.

147.     The Debtor also disclosed her 4.17% general partnership interest in Fairfield Development Associates; however, the Debtor listed the value of her ownership interest as "unknown".  Upon information and belief, Fairfield Development Associates is the owner of certain financial accounts as well as at least three parcels of real property.  While the Debtor has still failed to disclose the total estimated value of each parcel of real property, upon information and belief, the liquidation value of the Debtor's interest in Fairfield Development Associates is no less than $270,000.

148.     The Debtor disclosed that she owns approximately $39,600 of jewelry, all of which she claimed on her Schedules to be exempt under Florida law.

149.     The Debtor's Schedules included an inventory of the jewelry and a valuation that aggregates to the total value set forth above.

150.     However, even if the Debtor fully disclosed each piece of jewelry in her possession, the jewelry disclosed by the Debtor is, upon information and belief, significantly undervalued and well exceeds the threshold for exemptions of property of this kind under Florida law.

151.     As one example, the Debtor disclosed one piece of jewelry on her Schedules (e.g., the Audemars Piguet Lady Royal Oak Watch: Rose Gold and Diamond, 37 mm) as having a value of $5,000.  However, upon information and belief, that watch has a value exceeding $75,000.

152.     At the Debtor's 341 Meeting, the Debtor testified, under oath, that she has no interest in any trusts.  However, the Debtor's counsel clarified that the Debtor had actually disclosed a trust, the above-referenced Ranee Family Trust, on her Schedules, but neither the Debtor nor her attorney claimed to know her relationship to that trust or whether she had any interest in it, even though she

executed the trust instrument after driving from Miami Beach to West Palm Beach to sign it in the presence of a notary.

153.    Upon amending her Schedules on October 17, 2024, following her 341 Meeting, the Debtor did nothing to provide further clarity or detail regarding the Ranee Family Trust.

154.    Moreover, the Debtor continues in her failure to disclose her interest in the trusts established by her grandfather, which are believed to have an asset value of more than $10 million. Bartolacci has intentionally concealed from YH, this Court, the Trustee, and her other creditors, her financial interest in said trusts.

155.    Specifically, Raymond A. Bartolacci, Sr., the Debtor's grandfather ("Ray Sr."), who was the founder of the successful Laneco grocery and department store chain in Pennsylvania, established a Revocable Trust Agreement dated September 25, 1990, which was then amended and restated pursuant to a Cumulative Amendment on June 10, 2014 (the "Ray Sr. Trust").  Upon Ray Sr.'s death in 2015, the Ray Sr. Trust was divided into further trusts, including one for the benefit of Ray Jr., the Debtor's father (the "Ray Jr. Trust"), for Ray Jr.'s benefit and for the benefit of his issue, which includes the Debtor.  Upon information and belief, Ray Jr. and Donald Ayers ("Ayers"), the Bartolacci's family office's CFO, continue to serve as the co-trustees of the Ray Jr. Trust, which is governed by Florida law.

156.    The Ray Sr. Trust also provided for the creation of a generation-skipping tax trust (a "GST Trust"), under Article FIFTH thereof.

157.    Upon information and belief, in lieu of funding the GST Trust, in or about May 23, 2019, approximately $269,588 was paid outright to the Debtor pursuant to a nonjudicial settlement agreement.

158.    Upon information and belief, the Ray Jr. Trust, for the benefit of Ray Jr., the Debtor and her children, was in existence as of the Petition Date.

159.    Based on Ayers' testimony as the Independent Trustee of the Ray Jr. Trust, the Ray Jr. Trust received more than $11 million in assets from the Ray Sr. Trust in 2015.

160.    Upon information and belief, the Ray Jr. Trust continues to hold millions of dollars in assets in which the Debtor has an interest.

161.    As of this date, the Debtor has intentionally withheld and has failed to disclose information about the Ray Jr. Trust, including "Exhibit B" thereto ("Schedules of Distribution"), itemizing the assets that were distributed to the Ray Jr. Trust upon the death of Ray Sr.  Upon information and belief, Exhibit B will show that the Ray Jr. Trust was initially funded with more than $11 million.

162.    The Ray Jr. Trust authorizes the Independent Trustee (who is believed to still be Ayers) to currently distribute all the income *and* principal (including all the principal) to Ray Jr., the Debtor and her children.

163.    Under the terms of the Ray Jr. Trust, the Debtor is a vested discretionary principal and income beneficiary and residuary beneficiary of the trust.

164.    Under Florida law, the Debtor is a "qualified beneficiary" of the Ray Jr. Trust.  *See* Fla. Stat. Ann. § 736.0103.

165.    The Debtor is entitled to annual accounting and all relevant information about the assets and liabilities of the Ray Jr. Trust.  *See* Fla. Stat. §736.0813(1)(d) and (e).

166.    The Debtor was required to disclose her interest in the Ray Jr. Trust in her Schedules but failed to do so.

167.    The Debtor's Schedules instead allege only that Ray Jr. has purportedly loaned the Debtor no less than $5,225,041.82 since the end of 2022.

168.    Under the terms of the Ray Jr. Trust, the Debtor's father is only permitted to make distributions to himself limited to a "HEMS standard".[12]

169.    Upon information and belief, Debtor's father made millions of dollars of distributions to himself for the purpose of funneling the proceeds to Defendant in a series of purported "loans".  If discovery bears this out, this constitutes an unauthorized HEMS distribution by the Debtor's father to himself, which was designed to camouflage distributions from the Ray Jr. Trust to the Debtor as beneficiary of the Ray Jr. Trust, and to further defraud the Court and the Debtor's creditors.

170.    The Debtor's Schedules list Ray Jr. as a creditor for a purported personal loan in the amount of $4.2 million – which is less than the amount of the monies the Debtor appears to have received from Ray Jr.

171.    The Debtor testified at her 341 Meeting that promissory notes exist to document each of the purported loans from Ray Jr. to the Debtor.

172.    Upon information and belief, the promissory notes the Debtor made in favor of Ray Jr. do not include a maturity date or other indicia of a bona fide loan.

---

[12]   The "HEMS standard" (an acronym for "Health, Education, Maintenance, and Support") is a distribution standard used in trusts to ensure the trust assets are used for the beneficiary's legitimate personal needs rather than for unrestricted personal use.  The HEMS standard is derived from the Tax Code's use of an ascertainable standard, which provides a narrow interpretation of use for purposes of health, education, maintenance and support.  The HEMS standard is designed to prevent the trustee/beneficiary from having complete control over the trust property.  Where, as here, the Debtor's father may have exercised complete control of the trust assets, ignored legal formalities and used the property as his own (for Defendant's benefit), contrary to the terms of the trust, the trust may be invalid under the sham-trust doctrine and/or a court may pierce the veil of the trust.  The Court may also authorize the Trustee to recapture the Debtor's preferential transfers that were made in the form of disguised distributions from the Ray Jr. Trust for the benefit of the Debtor.

173.     Upon information and belief, Ray Jr. has not sought repayment of any of his loans to the Debtor.

174.     Upon information and belief, the Debtor is not receiving loans, but instead, current advances or distributions of her beneficial interest in the Ray Jr. Trust, which are being disguised as "loans" to the Debtor that will be immediately forgiven upon any bankruptcy discharge.

175.     Upon information and belief, discovery will show that the Debtor has already had access to millions of dollars from the Ray Jr. Trust and upon Ray Jr.'s death stands to inherit millions of dollars more, undermining her claim that this proceeding is a "no asset" case. Furthermore, upon information and belief, it appears that the Debtor's father used the Ray Jr. Trust to make conveyances to certain of the Debtor's creditors (ignoring other credits, like YH), for the Debtor's benefit, in a manner designed to prevent her creditors and the bankruptcy Trustee from attaching millions of dollars of trust distributions for her benefit.  Thus, the distribution of at least $5.2 million in purported loans to the Debtor may be subject to recapture by the bankruptcy Trustee for the benefit of the Debtor's bankruptcy estate.

176.     The Debtor's Schedules reflect that, as of the Petition Date, the Debtor maintained five personal bank accounts which collectively held a total of $3.48.

177.     The Debtor nevertheless disclosed in her Schedules that her monthly expenses total nearly $40,000 per month.

178.     At the Debtor's 341 Meeting, she testified that the purported loans from Ray Jr. are an aggregation of expenses, including the exorbitant attorneys' fees she has incurred to evade her creditors, including YH, that Ray Jr. pays directly to certain creditors on behalf of the Debtor rather than depositing monies into any of her bank accounts. This mechanism suggests that the payments from Ray Jr. are merely trust advances or disguised distributions from the Ray Jr. Trust for

Bartolacci's benefit, which is the only reason why the Debtor has not made transfers in excess of $7,575, as affirmed by the Debtor on her SOFA.

179.     The SOFA requires the Debtor to disclose bank accounts closed within one year prior to the Petition Date, to which the Debtor disclosed one account held at Chase in the name of one of the Debtor's businesses, Twisted with Love, LLC.

180.     However, the Debtor opened at least fifteen other bank accounts for which she was the owner or authorized signer, which were not disclosed on her Schedules, between March 29, 2021, mere days before the sale of 40 Meadow Lane, and September 9, 2022.  All but four of the fifteen undisclosed accounts were closed before the required reporting period on the SOFA, and a number of these accounts were closed by the banks for, among other reasons, enhanced documentary reviews and applicable regulatory guidelines in accordance with the Bank Secrecy Act and other regulations.

181.     Notwithstanding the closed accounts, the Debtor failed to disclose accounts which, upon information and belief, are still open, including but not limited to a personal checking account at UMB Bank ending in x4167 and a brokerage account at TD Ameritrade ending in x0953.

182.     In addition, upon information and belief, the Debtor also holds an interest in additional undisclosed accounts in the name of Ermitage, which includes a precious metals account at Money Metals Exchange, and RSV One, LLC, which includes a business checking account at Citibank.

183.     The Debtor also listed many creditors whom she claims are her husband's creditors, though many of those same creditors have or may assert claims against her because of the fraud scheme she orchestrated with her ex-husband.

184.     If the Debtor asserts that these are not her creditors, then listing them on her Schedules is misleading to the Court and the Debtor's legitimate creditors.

13559119-7

185.    The Debtor listed 106 general unsecured creditors on her Schedules, totaling $16,242,686.23 in unsecured debt.

186.    Eliminating creditors with general unsecured claims whom the Debtor claims are listed "for notice purposes only" (though there is a separate section to list creditors for notice purposes, which the Debtor separately completed), or related to debts owed by Meir, the Debtor claims to have only 23 general unsecured creditors with a total of $5,988,058.29 in claims she believes are correctly asserted against only her.  Of the 23 direct unsecured claims, 12 of those claims are for purported loans made to her by her father which constitutes $5,561,437.77 of the $5,988,058.29 in "direct claims".  The balance of the "direct claims" is for attorneys' fees.[13]

187.    Upon information and belief and notwithstanding her bankruptcy filing, the Debtor is still leading the same extravagant lifestyle she always led, including during the timeframe when she benefitted from the Fraudulently Conveyed Assets and continues to conduct her affairs in a manner designed to evade her creditors while she continues to live extravagantly at their expense.

188.    She and her three children briefly lived with her parents in Florida, which would have reduced the Debtor's living expenses.  But she moved back to Miami Beach, resuming a $40,000 per month lifestyle, while claiming to have no income and no assets.

189.    Debtor has not modified her lifestyle to reflect her purported current financial circumstances, evidence that she filed this bankruptcy to discharge her debts to shield money she has access to and continues to receive from her father from other sources and creditors with, upon

---

[13] Upon information and belief, Ray Jr.'s advances to or on behalf of the Debtor, were used to pay a significant portion of the Debtor's professional fees, making it unclear whether the claims for unpaid professional fees on Bartolacci's Schedules are valid claims against the Debtor.  As of the date of this Complaint, which is approximately one week prior to the claims bar date, only one creditor has filed a claim against the Debtor for professional fees, which the Debtor has asserted a malpractice claim against the professional.

information and belief, the expectation that she will have access to additional assets or financial recourses following the case – leaving her legitimate creditors, like YH, with nothing.

190.    The Debtor further misrepresented to this Court that, even after "that transfer" (actually, two transfers - one to the Debtor directly ($10,587,387.52) and a second to Ermitage ($2,000,000)), that Meir, not the Debtor, continued to control the Fraudulently Conveyed Assets.

191.    The Debtor exercised dominion and control over the monies fraudulently transferred to her, had knowledge of the obligation to YH, and colluded with Meir to dissipate the funds, notwithstanding the claims by YH and other creditors.

## FIRST CAUSE OF ACTION
### Determination of Non-Dischargeability of Debt
### 11 U.S.C. §§ 523(a)(2)
### For Money, Property, Services Obtained by False Pretenses, Representations or Actual Fraud

192.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 191 of this Complaint as if fully set forth at length herein.

193.    Defendant's actions resulted in a debt to Plaintiff for money in a sum to be determined at trial, which was caused by Defendant's false representations, false pretenses, or actual fraud, other than a statement respecting the Debtor's or an insider's financial condition.

194.    Defendant knowingly participated in fraudulently diverting funds from the sale of 40 Meadow Lane, an asset which she did not own, for her own personal use and benefit.

195.    Defendant participated in the Meir-Bartolacci fraud scheme, starting at a time that litigation was pending against Meir and the entry of the Meir Judgment was imminent, including the creation of Ermitage on the eve of the sale of 40 Meadow Lane.

196.    Since the creation of Ermitage, first in New York and then in Florida, it has not had a legitimate business purpose and lacks business operations.

197.    Defendant created Ermitage for the sole purpose of facilitating the Meir-Bartolacci fraud scheme, as alleged herein, as a co-conspirator with Meir.

198.    Defendant had knowledge that the net sale proceeds of 40 Meadow Lane were transferred to her and to Ermitage to avoid the then imminent Meir Judgment and to place the funds outside the reach of creditors, including YH.

199.    Defendant had complete dominion and control over the funds fraudulently transferred to her directly and to Ermitage from the net sale proceeds of 40 Meadow Lane.

200.    Defendant continued to use the funds fraudulently diverted to her directly and to Ermitage for her own personal benefit, at the expense of Plaintiff, which the Defendant squandered despite her knowledge of the Meir Judgment and later, despite her obligations to Plaintiff under the Bartolacci Judgment, and in violation of restraining notices, and orders of attachment and garnishment.

201.    Defendant made numerous false representations with the intent to deceive the Plaintiff and to mislead the courts of New York, Florida and Delaware to impede and interfere with Plaintiff's enforcement of its judgments.

202.    Plaintiff, and the courts, relied on Defendant's representations and misrepresentations.

203.    Plaintiff was injured by Defendant's representations and suffered damages in an amount to be determined at trial, but not less than $13,903,573.02, plus interest, costs and attorneys' fees.

204.    Defendant's debt to Plaintiff should be excepted from discharge pursuant to Section 523(a)(2) of the Bankruptcy Code.

## SECOND CAUSE OF ACTION
### Determination of Non-Dischargeability of Debt
### 11 U.S.C. §§ 523(a)(6)
### For Willful or Malicious Injury by the Debtor to Another Entity or the Property of Another Entity

205.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 204 of this Complaint as if fully set forth at length herein.

206.    Defendant engaged in an intentional scheme to defraud Plaintiff.

207.    Defendant intentionally engaged in fraud and self-dealing and for her own self-interest when she diverted funds, the proceeds of the sale of 40 Meadow Lane, to which she was not entitled and should have been used to satisfy the YH Judgment, for her own personal use and benefit.

208.    Defendant's actions or failures to act constitute willful and malicious injury by Defendant to Plaintiff and courts in New York, Delaware and Florida.

209.    Plaintiff was injured by Defendant's actions and suffered damages in an amount to be determined at trial, but not less than $13,903,573.02, plus interest, costs and attorneys' fees.

210.    Defendant's debt to Plaintiff should be excepted from discharge pursuant to Section 523(a)(6) of the Bankruptcy Code.

## THIRD CAUSE OF ACTION
### Denial of Debtor's Discharge
### 11 U.S.C. §§ 727(a)(2)(A)
### For Concealment of Property Within 1 Year Before the Petition Date

211.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 210 of this Complaint as if fully set forth at length herein.

212.    Pursuant to Section 727(a)(2) of the Bankruptcy Code, "[T]he court shall grant the debtor a discharge unless "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the state charged with custody of property under this title, has transferred, removed, destroyed,

13559119-7

mutilated or concealed property of the debtor, within one year before the date of the filing of the petition [...]."

213.    Defendant, with the intent to hinder, delay or defraud her creditors and the Trustee, concealed property of the Defendant within one year before the date of the filing of the Petition.

214.    Defendant, with the intent to hinder, delay or defraud a creditor of her estate, transferred monies she had access to from the sale proceeds of 40 Meadow Lane to herself for her own use and enjoyment at the expense of Plaintiff within the one year prior to the Petition Date.

215.    The Defendant failed to disclose, and has in fact concealed, that she transferred the remaining proceeds of the 40 Meadow Lane sale, which she and Ermitage received as fraudulent transfers to evade creditors, including Plaintiff, within the year before the Petition Date.

216.    The Defendant also knowingly and fraudulently failed to disclose her legal interest in certain assets, or the value thereof, including certain bank accounts, in connection with her bankruptcy case.

217.    Defendant knowingly accepted "loans" from Ray Jr., which were intentionally paid directly to some of the Defendant's creditors while she intentionally avoided her other creditors, including YH.  These loans were, upon information and belief, disguised distributions or distributions structured to avoid disclosure of the source of the funds as distributions from the Ray Jr. Trust for the benefit of the Defendant.

218.    Therefore, the Trustee is entitled to the finding that the Defendant acted with the intent to hinder, defraud, or delay her creditors or the Trustee.  Consequently, Defendant's discharge must be denied pursuant to Section 727(a)(2)(A) of the Bankruptcy Code.

13559119-7

## FOURTH CAUSE OF ACTION
### Denial of Debtor's Discharge
### 11 U.S.C. §§ 727(a)(2)(B)
### For Concealment of Property After the Petition Date

219. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 218 of this Complaint as if fully set forth at length herein.

220. Pursuant to Section 727(a)(2) of the Bankruptcy Code, "[T]he court shall grant the debtor a discharge unless "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the state charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed property of the debtor, […] or property of the estate after date of the filing of the petition."

221. The Defendant, with intent to hinder, delay, and defraud her creditors and the Trustee, concealed property of the estate, after the date of the filing of the Petition.

222. At the time the Defendant filed her bankruptcy petition, the Defendant held a legal and beneficial interest in the Ray Jr. Trust.

223. The contingent value of the Ray Jr. Trust was, upon information and belief, approximately $9 million to $11 million on or around the Petition Date.

224. The Defendant did not disclose her legal interest in the Ray Jr. Trust on her bankruptcy Schedules.

225. The Defendant fraudulently concerned her contingent beneficiary ownership interest in the Ray Jr. Trust for little or no consideration.

226. The Defendant did not disclose, and in fact testified that she did not have an interest in any trusts at her 341 Meeting. Upon correction by her counsel, she acknowledged the existence of the

13559119-7

Ranee Bartolacci Family Trust of 2021, but the Defendant denied having any knowledge of the amount of her interest therein or her rights with respect to the trust.

227.    The Defendant knowingly and fraudulently failed to disclose both on her Schedules and in her 341 Meeting testimony her legal interest in the Ray Jr. trust in connection with this bankruptcy case.

228.    Defendant failed to disclose that the "loans" from Ray, Jr., which comprise most of the "direct" unsecured claims on her Schedules, are, upon information and belief, "advances" against her interest in the Ray Jr. Trust or disguised trust distributions.

229.    In addition, upon information and belief, the Defendant knowingly underestimated the value of the jewelry disclosed in her Schedules with the intent of misleading the Trustee to believe the jewelry had no value exceeding her claimed exemption.

230.    The Trustee and other creditors have and will be requesting additional information and valuation of these assets in connection with the Defendant's bankruptcy case.

231.    Upon information and belief, the Defendant failed to disclose certain bank accounts in which she has an interest and are not closed on her Schedules.

232.    Therefore, the Trustee is entitled to a finding that the Defendant acted with the intent to hinder, defraud, or delay her creditors or the Trustee when she concealed her interests in the non-exempt value of her jewelry and in the Ray Jr. Trust, both of which are property of the estate. Consequently, the Court must deny the Debtor's discharge pursuant to Section 727(a)(2)(B) of the Bankruptcy Code.

13559119-7

## FIFTH CAUSE OF ACTION
### 11 U.S.C. §§ 727(a)(4)
### False Oaths, Accounts or Claims

233.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 232 of this Complaint as if fully set forth at length herein.

234.    The Defendant knowingly and fraudulently, or in connection with this Case, made numerous false oaths and accounts on her Petition.

235.    The Defendant made false declarations and omissions, under penalty of perjury, that her Schedules, Statement of Financial Affairs and Petition were true and correct when in fact they were not.

236.    The Defendant also gave a false and misleading account to the Trustee at the 341 Meeting.

237.    The Defendant knowingly and intentionally failed to disclose her contingent beneficial ownership interest in the Ray Jr. Trust.

238.    The Defendant knowingly and intentionally undervalued her jewelry to claim a full exemption and retain the jewelry, when the actual value exceeds the exemption amount and should be available to the Defendant's creditors.

239.    The Defendant knowingly and intentionally omitted the disclosure of certain banking and other accounts from her Schedules.

240.    The Defendant made each and all of the foregoing false statements or omissions under oath in connection with this bankruptcy case.

241.    Therefore, the Defendant's discharge must be denied pursuant to Section 727(a)(4) of the Bankruptcy Code.

13559119-7

## SIXTH CAUSE OF ACTION
### 11 U.S.C. §§ 727(a)(5)
### Failure to Explain Any Loss or Transfer of Assets

242.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 241 of this Complaint as if fully set forth at length herein.

243.    The Defendant has failed to explain satisfactorily the loss or transfer of assets or deficiency of assets alleged above that would otherwise be used to meet the Defendant's liabilities.

244.    The Defendant failed to satisfactorily explain how or for what purpose she spent nearly $13 million in proceeds of the sale of 40 Meadow Lane, which were fraudulently transferred to her and Ermitage in the three years before the Petition Date.

245.    The Defendant failed to satisfactorily explain how or for what purpose she spent more than $5.2 million she received from her father in less than two years prior to the Petition Date.

246.    In view of the foregoing, the Debtor's discharge must be denied pursuant to Section 727(a)(5) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

The Plaintiff's investigation into the Debtor's assets and financial affairs is ongoing. The Plaintiff hereby expressly reserves the right to amend and/or supplement the factual bases and/or the relief request by this Complaint.

**WHEREFORE**, Plaintiff respectfully requests that a judgment or judgments be entered against Defendant as follows:

i.   On the First Cause of Action, a judgment determining that the debt owed by the Defendant to the Plaintiff is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2) of the Bankruptcy Code;

ii.  On the Second Cause of Action, a judgment determining that the debt owed by the Defendant to the Plaintiff is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6);

13559119-7

iii. On the Third Cause of Action, denial of the Debtor's Chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(2)(A);

iv. On the Fourth Cause of Action, denial of the Debtor's Chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(2)(B);

v. On the Fifth Cause of Action, denial of the Debtor's Chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(4);

vi. On the Sixth Cause of Action, denial of the Debtor's Chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(5);

vii. Awarding Plaintiff reasonable attorneys' fees and costs in connection with obtaining a judgment or judgments in favor of the Plaintiff in connection with any of the foregoing causes of action; and

viii. Granting such other and further relief as the Bankruptcy Court deems just and proper.


Dated:  April 8, 2025

BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Tel: (305) 755-9500
Fax: (305) 714-4340

By: */s/ Jordi Guso*
      Jordi Guso
      Florida Bar No. 863580
      jguso@bergersingerman.com

-and-

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Tracy L. Klestadt
tklestadt@klestadt.com
Kathleen M. Aiello, *Admitted Pro Hac Vice*
kaiello@klestadt.com

*Co-Counsel for YH Lex Estates, LLC*

50

13559119-7